**Maria Ernst MORTON, Plaintiff,**

v.

**Joseph W. MORTON, Defendant.**

**No. 4:96CV3381.**

United States District Court,
D. Nebraska.

Oct. 30, 1997.

---

**5.** In their memorandum in opposition to Randall's motion to remand, IMG and Gusto cite but a single district court case, *Connecticut Bank & Trust Co., N.A. v. CT Partners, Inc.*, 136 F.R.D. 347 (D.Conn.1991), in support of their contention that removal by third-party defendants is proper. In that case, the court permitted the Federal Deposit Insurance Corporation ("FDIC"), as receiver for an insolvent financial institution, to remove an action that had been initiated by that institution prior to its insolvency. IMG and Gusto argue that if a plaintiff can

be allowed to remove, then removal by a third-party defendant should be permissible as well. In so arguing, they ignore the fact that the *CT Partners, Inc.* court permitted removal on the ground that the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. §§ 1811 *et seq.*, authorizes the FDIC to remove any action to which it is a party. 136 F.R.D. at 349. IMG and Gusto can point to no similar statutory support for the type of removal that they seek.

Herbert M. Sampson, III, The Sampson Firm, P.C., Omaha, NE, for Plaintiff.

Kathleen M. Neary, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Maria Ernst Morton (Maria), a German citizen, has sued her former husband, Joseph W. Morton (Joe), an American citizen. Maria and Joe are the parents of Stephan Morton (Stephan), a minor male child. Joe, who resides in Lincoln, Nebraska, presently has physical and legal custody of Stephan.

Maria claims that a Utah court, and later a German court, violated her rights under the Hague Convention[1] when the Utah court placed custody of Stephan with Joe and when both courts ordered that Stephan be returned to Joe. Accordingly, she requests that I grant habeas corpus relief requiring Joe to return Stephan to Maria.[2]

Maria and Joe agree that the facts are undisputed.[3] They have each moved for summary judgment. After carefully reviewing the complex evidentiary and legal submissions of the parties, I have decided to grant summary judgment in favor of Joe. My reasons for this ruling are set forth below.

## I. Findings of Fact

I find the following undisputed facts to be material:

### The Parties

1. Maria is a citizen of Germany, Joe is a citizen of the United States, and, although born in the United States, "Stephan has both nationalities" according to German law. (Filing 84, Ex. D (German Documents)[4], Doc. 6, at Page 3 (Decision of AG Viechtach (Family Court) on January 10, 1996).)

2. Stephan was born on October 12, 1989, as the legitimate child of his biological parents, Maria and Joe. (Filing 84, Ex. C (Utah Documents)[5], Doc. 2, at Page 2 (Judgment and Decree of Divorce dated May 11, 1994).)

### The May 1994 Divorce

3. By a stipulation prepared by their lawyers after Maria filed a petition for divorce, a Utah court on May 11, 1994, dissolved the marriage between Maria and Joe. (*Id.*)

4. The decree of divorce generally granted "care, custody and control" of Stephan, who was then residing in Utah, to Maria, who was also residing in Utah, but the decree further granted liberal and extensive visitation rights to Joe. (*Id.* at Pages 2–3.) The decree also required Joe to pay child support. (*Id.* at Page 3.) While the decree provided that Maria could "take the minor child to Germany during the summer months to visit with her family," the decree limited the right of Maria or Joe to permanently remove the child from the United States without advance notice. (*Id.* at Pages 2–3.) Specifically, the decree required that the "parties shall provide one another with ... at least 90 days notice if either party intends to move from the United States." (*Id.* at Page 3.)

---

1. *See* Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 51 Fed.Reg. 10494, 10498–502 (App.B) (1986), as implemented by the United States in the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610.

2. This court has subject matter jurisdiction to consider Maria's complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 11603(a).

3. As Maria states in her brief, "The facts of this case are not in dispute. Generally, all of the actions of the parties and the actions of the Courts are matters of public record." (Pl.'s Br. Supp. Mot. Summ. J. at 3.) Counsel for both parties are to be complimented for their hard work in preparing this unusual case for summary judgment.

4. The parties have provided me with an agreed translation of all German documents. When cit-

ing these German documents, I have referred to the parties' stipulation regarding admission of the German documents (filing 84, ex. D). The actual documents may be found in a black notebook which is part of the parties' evidentiary submission and is labeled "4:96CV3381–A79B." The original version of the parties' stipulation regarding admission of the German documents appears at the front of this black notebook.

5. When citing these Utah documents, I have referred to the parties' stipulation regarding admission of the Utah documents (filing 84, ex. C). The actual documents may be found in a black notebook which is part of the parties' evidentiary submission and is labeled "4:96CV3381–A79C." The original version of the parties' stipulation regarding admission of the Utah documents appears at the front of this black notebook.

### The Winter 1994 Abduction

5. After Joe had once been jailed for failing to pay child support, Maria, without sending Joe the required 90–day notice, left Utah, traveled to Germany with Stephan and after that refused to return to the United States with the boy. (Filing 79, Aff. Maria E. Morton ¶¶ 9–12 & 17–18; Filing 84, Ex. D (German Documents), Doc. 6, at Page 3 (Decision of AG Viechtach (Family Court) on January 10, 1996).) At the time Maria left for Germany with Stephan, Joe, Maria and Stephen resided in Utah. (Filing 79, Aff. Maria E. Morton ¶¶ 9–12 & 18.)

6. During a hearing in Germany, where German counsel represented her, Maria admitted that she knew she was violating the Utah court's divorce decree when she took Stephan to Germany. She told the German court: "It is correct, that I did not properly inform [Stephan's] father before we left on December 5, 1994" and "I knew that if I had given formal notice, I would not have been able to leave with Stephan." (Filing 84, Ex. D (German Documents), Doc. 4, at Page 3 (Tr. AG Viechtach Hr'g (Family Court) on Nov. 13, 1995).)

### Joe Prevails in Spring/Summer 1995 Utah Litigation

7. In the spring of 1995, but before the filing of any action by Joe to enforce his rights under the divorce decree, Maria told Joe during a telephone call that "I don't work with my [Utah] attorney anymore" and Maria's prior retention of the lawyer was "finished." (Filing 83 ¶ 9 (Aff. Joseph Morton); Filing 82 ¶ 6 (Aff. Ann Morton [6] & Attached Tr. of Telephone Conversation with Maria).)

**6.** Mrs. Morton is Joe's present wife.

**7.** As pertinent here, Rule 4–506 provides that all unrepresented parties must be served with notice, 20 days in advance of the court acting on a represented party's motion, of the unrepresented party's responsibility to retain counsel or appear pro se. UTAH CODE JUD. ADMIN R4–506(3) (MICHIE 1996). However, the failure to comply with the Rule does not divest the court of jurisdiction. *See, e.g., Hartford Leasing Corp. v. State of Utah,* 888 P.2d 694, 700 n. 7 (Utah.Ct.App.1994) (opposing counsel's failure to notify unrepresented party in accordance with the Rule did not deprive the court of jurisdiction).

**8.** Under the "Hague Convention" each country has a Central Authority which, among other

[■] 8. On April 26, 1995, Joe, through his Utah lawyer, M. Joy Jelte (Jelte), filed with the Utah court an ex parte petition seeking the return of Stephan, a motion to waive the requirements of Rule 4–506 [7] and Joe's affidavit in support of those requests. (Filing 84, Ex. C (Utah Documents), Docs. 4–6.) As a matter of professional courtesy, Jelte told Joe that she would mail a copy of the petition and motion to Maria's former Utah counsel, Brent Chipman (Chipman). (Filing 83, Aff. Joseph Morton ¶ 9.)

9. On April 27, 1995, the Utah court, acting by the same judge who had granted the earlier divorce decree, entered an order. It provided that Maria was to deliver Stephan to Germany's Central Authority [8], that the Central Authority was to deliver the child to the American State Department and the State Department "shall allow the child to be delivered to [Joe at a residence in Utah] ." (Filing 84, Ex. C (Utah Documents), Doc. 7, at Pages 4–5 (Order for Enforcement of Orders and Pick Up Order).) If Maria failed to comply with the order, the court further ordered that any law enforcement officer "is hereby ordered to enforce these orders by picking up the minor child and delivering the minor" according to the order. (*Id.*)

10. The Utah court based its decision upon two points. First, the Utah court decided that Maria had violated the court's prior divorce decree by taking Stephan to Germany. In particular, the court decided that Maria violated those provisions of the divorce decree relating to Joe's parental right of visitation and the 90–day notice re-

things, serves to implement provisions of the Convention for that country. *See* CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, Oct. 25, 1980, 51 Fed.Reg. 10498 (1986) (providing in Article 7(a) & (h) that a "Central Authority" shall take "all appropriate measures" to "discover the whereabouts of a child who has been wrongfully removed or retained" and "to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child"). Germany is a signatory to the Convention. (Filing 84, Ex. D (German Documents), Doc. 7, at Page 4 (Decision of Oberlandesgericht Munchen) (Appeals Court decision of April 17, 1996).)

quirement for moving from the United States. (*Id.* at Pages 2–4.) Second, the court decided that Maria's actions permitted the court to compel the return of the child pursuant to the provisions of Utah law, the Hague Convention and the International Child Abduction Remedies Act enacted by the United States to carry out the Convention. (*Id.*)

11. On April 27, 1995, the court also granted Joe's motion to waive compliance with Rule 4–506. (*Id.* Doc. 8 (Order Waiving Requirement of Rule 4–506).) The court found that substantial prejudice would accrue to Joe and Stephan without a waiver. (*Id.*) In particular, the court found that "there is a need for the entry of immediate orders in this matter, and the failure to consider and enter such orders may result in substantial prejudice to the position of [Joe], and further may result in significant harm to the minor child of the parties." (*Id.* at Pages 1–2.) In the order granting Joe affirmative relief, the court also found that "said minor child is in danger of suffering irreparable harm and injury should this court fail to immediately enforce prior orders which have been entered in this matter." (*Id.* Doc. 7, at Page 2.)[9]

12. On May 1, 1995, Joe filed the following items with the Utah court: (a) a petition for return of Stephan pursuant to 42 U.S.C. § 11601 *et seq.*, and the Hague Convention; (b) an amended application for assistance according to the Hague Convention; (c) a petition for modification of the decree of divorce and a first petition for custodial interference; (d) a notice of hearing; and (e) a motion for order to show cause. (*Id.* Docs. 9–10 & 12–14.)

13. On that same day, May 1, 1995, the Utah court entered an order to show cause. It required, among other things, that Maria show cause why custody of Stephan should not be transferred to Joe and why Maria should not have sanctions imposed against her for violating the earlier divorce decree.

(*Id.* Doc. 15.) Specifically, the court ordered Maria to appear before it on July 10, 1995. (*Id.*) The order also provided that service of the order was to be made on Maria at an address in Germany. (*Id.* at Page 3.)

14. On May 19, 1995, Chipman, acting again as counsel for Maria, signed and later filed (on May 22, 1995) the following documents with the Utah court: (a) a motion to set aside ex parte orders and motion to stay further enforcement; (b) objection to entry of ex parte orders and pick up order; (c) acceptance of service of summons and petition for return of the child under 42 U.S.C. § 11601 and notice of hearing (in which he expressly "waives any objection or claim regarding sufficiency of service of process herein"); (d) acceptance of service of the following (i) motion to waive requirements of Rule 4–506, (ii) affidavit of Joe, (iii) motion for enforcement and (iv) pick up order and order (in which he expressly "waives any objection or claim regarding sufficiency of service of process herein"). (*Id.* Docs. 16–19.)

15. As the Utah court's minutes reflect, on July 6, 1995, the court considered Maria's motion to set aside the ex parte order and the objection to the pick up order. (*Id.* Doc. 25 (Minute Entry).) Chipman, Maria's lawyer, was present. The court took the matter under advisement pending a hearing on the court's earlier show cause order. Again, the court ordered that Maria attend the show cause hearing, which the court then rescheduled to July 28, 1995. (*Id.*) In a more formal order, which both lawyers had the opportunity to review before the judge's signature (*id.* doc. 23 (Chipman's objections to proposed order) & attached ex. A (letter from Chipman to Jelte)), the court specifically found that it "is reasonable, just and proper that this court exercise jurisdiction over the parties and the subject matter." (*Id.* Doc. 25, at Page 2 ¶ 5.) Chipman did not object to this finding. (*Id.* Doc. 23 & Attached Ex. A

**9.** In Utah, the equitable power of a court in a domestic relations case to issue an ex parte mandatory order is not limited by the general civil procedure rules. UTAH RULES OF CIVIL PROCEDURE 65A(f) (Michie 1996) ("Nothing in this rule shall be construed to limit the equitable powers of the courts in domestic relations cases.") Utah law

specifically contemplates that "in domestic relations cases courts must occasionally enter prohibitory or mandatory orders under circumstances that do not permit compliance with the procedures in Rule 65A." *Id.* at Advisory Committee Note.

(Letter from Chipman to Jelte).) The court also found that Joe's counsel "has acted at all times in good faith and within the highest ethical standards" because "Ms. Jelte believed that [Maria] was no longer represented by Mr. Chipman based upon [Maria's] statements to [Joe]." (*Id.* Doc. 25, at Page 3 ¶ 8.)

16. On June 19, 1995, Maria, through Chipman, filed with the Utah court an answer to petition for modification and an answer to petition for custodial interference. (*Id.* Doc. 21.) Although Maria raised various defenses, she did not claim that the Utah court lacked subject matter jurisdiction to change custody. (*Id.*)

17. On July 27, 1995, the Utah court held a hearing. (*Id.* Docs. 24 & 29.) Joe and Jelte appeared, and Chipman appeared as well. Maria was absent. The court apparently held this hearing instead of the one previously scheduled for July 28, 1995. The court found that: "Mr. Chipman has advised the court that he instructed [Maria] to appear and advised [Maria] that she was ordered to appear before this court with the minor child on July 27, 1995, and that [Maria] refuses to appear." (*Id.* Doc. 29, at Page 2.)

18. Because Joe had made funds available to Chipman "for the purpose of purchasing her airline tickets" and because Maria had willfully and voluntarily absented herself despite the earlier orders, the Utah court held Maria in contempt of court. (*Id.* Doc. 29, at Pages 2–3.) (Chipman approved this order "as reflecting the ruling of the court.") The matter was continued until August 2, 1995. (*Id.* Doc. 24.)

19. On August 2, 1995, the Utah court held another hearing. (*Id.* Doc. 27 (Judgment and Order of Modification).) Chipman appeared for Maria, but Maria did not appear despite "having received adequate notice and having refused to appear in person." (*Id.*) The court considered pending matters, awarded sole temporary and permanent cus-

tody of Stephan to Joe, and ordered Maria to return the child to the United States. (*Id.* at Page 2.) [10] Chipman approved the order "as reflecting the order of *the* court." (*Id.* at Page 3.)

20. Regarding the August 2 hearing, and as will become evident later, the Utah court did not explicitly rule upon Joe's pending petition for return of the child under 42 U.S.C. § 11601 *et. seq.*, about which Chipman had expressly waived any objection or claim regarding the sufficiency of service of process. Although the court ordered Maria to return the child to the United States, the court did not specifically state that its ruling was predicated upon the Hague Convention.

21. On August 22, 1995, apparently believing that there was no longer any further legal action to take in Utah, Jelte withdrew as counsel for Joe in the Utah action. (Filing 83, Aff. Joseph Morton ¶ 14.)

### Joe's August through November 1995 German Litigation

22. On August 28, 1995, Joe, with the assistance of German counsel, filed a petition with a German family court seeking assistance under the Hague Convention and specifically asking the court to "order [Maria] to relinquish the child Stephan Morton, born on 10/12/89 to [Joe] immediately." (Filing 84, Ex. D (German Documents), Doc. 6, at Page 3 (Decision of AG Viechtach (Family Court)).) Maria also filed a petition with the same German court asking that Joe's petition be denied and that "parental care and custody for Stephan be transferred to her." (*Id.*) [11]

23. On November 6, 1995, the German court ordered the Youth Welfare Office to conduct an examination to decide whether returning the boy to the United States would harm Stephan. (*Id.* Doc. 2, at Pages 2–3.) On November 10, 1995, the court also decided that Stephan would temporarily remain with Maria, but that Joe would have visitation rights. (*Id.* Doc. 3.)

---

**10.** Among other things, the order stated: "Plaintiff is ordered to return the child immediately to the United States of America." (*Id.*)

**11.** Maria evidently sought the assistance of the German court first because on July 18, 1995, Maria filed with the court a motion for recognition of the Utah divorce decree. (Filing 79, Aff. Maria E. Morton, at 6–7 & ¶ 28.)

24. The German court also ordered an evidentiary hearing, and that hearing was held on November 13, 1995. (*Id.* Doc. 4.) Maria was present at the hearing with her German lawyer. Joe was also present with his German lawyer. Stephan was present as well. In addition, a representative of the German Youth Welfare Office was present. The court used the services of an interpreter who was sworn.

25. The court took evidence that included the testimony of Maria, Joe and the welfare worker. (*Id.* at Pages 3–5). The court also interviewed Stephan in the presence of the welfare worker only. (*Id.* at Page 1.) The judge further heard the arguments of the lawyers. (*Id.* at Page 5.) The court announced that it would render a decision on December 6, 1995. (*Id.* at Page 6.)

### The Utah Court's December 1, 1995, Clarification

26. In May of 1995, Joe had submitted to the American Central Authority a request for assistance under the Hague Convention that the American Central Authority submitted to the German Central Authority in June of 1995. (Filing 85, Aff. Ann Morton ¶ 4.) In the fall of 1995, Joe received a letter, dated October 25, 1995, from the American State Department, acting as the American Central Authority. The letter described the German Central Authority's rejection of Joe's first application. The American Central Authority then suggested another course of action:

Dear Mr. Morton:

Thank you for your recent inquiry concerning your Hague application requesting the return of your, Stephen [*sic*], from Germany to the United States.

First, let me direct your attention to Article 3(a) of the Hague Convention which states that the removal or the retention of a child is considered wrongful wherein it is in breach of rights of custody attributed to a person under the law of the State in which the child was habitually resident immediately before the removal or retention. In this instance, an application for assistance under the Hague Convention in securing the return of a child would be appropriate.

*In your case, however, the German Central Authority concluded that you had a right of visitation or access rather than a right of custody at the time of Stephan's removal from the United States. In this instance, an application for assistance under the Hague Convention requesting access or visitation rights rather than the return of the child would be appropriate.*

*If, however, you believe you did in fact have a right of custody at the time of Stephan's removal from the United States, then you will need to obtain from a court in your state a determination under Article 15 of the Convention stating that Stephan's removal was wrongful within the meaning of Article 3 of the Convention. Upon receipt of such a court decision, we would be pleased to request that the German Central Authority reconsider your Hague application for return.*

*Meanwhile, we wish to draw your attention to Article 29 of the Convention which states that, "This Convention shall not preclude any person, institution or body who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention."*

I hope this information is helpful. If you have any further questions or need additional information, please feel free to contact me at 202–647–2579 (Fax: 202–647–2835).

Sincerely yours,

Anita D. Banks

Consular Officer

Office of Children's Issues

(Filing 69, Dep. Joseph W. Morton, Ex. 24.)

27. Given the State Department's letter of October 25, 1995, and what Joe had heard at the German court hearing on November 13, 1995, Joe and Ann Morton concluded that the Utah court needed to clarify its earlier orders. (Filing 83, Aff. Joseph Morton

¶¶ 16–17; Filing 82, Aff. Ann Morton ¶¶ 15–16.)

28. In late November of 1995, Joe caused two letters to be sent to the Utah court. (Filing 84, Ex. C (Utah Documents), Docs. 31 & 32 (letters received by Utah court on Nov. 27, 1995, and November 29, 1995).) Ann Morton, Joe's wife, drafted the letters and Joe either approved the letters at the time they were signed by Mrs. Morton for her husband or he later ratified them. (Filing 69, Dep. Joseph W. Morton, at 19:1–5; 24:1–25; 25:1–3.)

29. Joe's letters asked the Utah court to clarify its prior rulings. In particular, the second letter asked the Utah court to issue an "Order of Wrongful Removal" under the Hague Convention. (Filing 84, Ex. C (Utah Documents), Doc. 32 (letter received by Utah court on Nov. 29, 1995).) A draft order was enclosed with the letter, and, among other things,[12] Joe said that the order had been requested by the "Central Authority." (Id.) Joe did not specify whether he was referring to the American or the German "Central Authority." (Id.)

30. Treating Joe's letters as a motion, on November 29, 1995, the Utah court held a hearing in chambers.[13] (Id. Doc. 35, at Page 2 (Judge's initialed handwritten marginal notation).) Although the parties were not present at the hearing, Chipman again represented Maria and Jelte again represented Joe. (Id.; Filing 84, Ex. A, Dep. Brent R. Chipman, at 47:11–13 ("[M]y log sheets do note that I met with the judge and with Joy Jelte to review the order of wrongful removal submitted by Joe Morton.").)

31. On November 29, 1995, the Utah court issued the abbreviated order that Joe had submitted with his second letter. (Filing 84, Ex. C (Utah Documents), Doc. 33.) However, Jelte, who had reentered the case for Joe, was not satisfied with the order included with Joe's letter, and as a result, "the judge indicated therefore that Mrs. Jelte should prepare another order." (Filing 84, Ex. A, Dep. Brent R. Chipman, at 47:19–20.)

32. Jelte prepared the second order, and before the judge signed the second order, it was presented to Chipman for his review. (Filing 84, Ex. C (Utah Documents), Doc. 34.) Chipman filed written objections to the proposed order on November 30, 1995. (Id.)

33. On December 1, 1995, after explicitly considering and rejecting Chipman's objections (id. doc. 35, at page 7), the Utah court entered the second order. (Id.) In pertinent part, the order found that:

3. Consistent with the defendant/petitioner's pleadings, the court finds that the defendant/petitioner holds a right of custody of the child within the meaning of Articles 3 and 5 of The Convention and pursuant to the laws of the State of Utah, United States of America. Defendant was awarded the right to frequent, ongoing and meaningful contact with the minor child including the right to fully participate in the child's school, social, sports and community functions; the right to access directly to all school, surrogate care providers, and medical information; and, to be notified immediately in the event of medical emergency; the right of liberal telephone contact and uncensored mail privileges; the right to provide child care; the right to celebrate with the child religious beliefs and holidays held by the defendant/petitioner; the right to have a voice in the choice of the child's country of residence; and to establish his own residence outside the United States of America and to exercise visitation in the country of his habitual residence subject to notice; the right to select an appropriate counselor to provide counseling for the child, to receive reports from the counselor and the right to receive financial contribution where necessary from the plaintiff/respondent toward the child's health insurance, day care expense and medical and dental expenses. Paragraph 9 of the Decree of Divorce required and mandated that the parties provide at least 90 days notice if either party intends to move from the United States.

---

12. For example, Joe also asked that the contempt order against Maria be lifted.

13. The judge described the proceeding as an "informal hearing." (Id.)

4. On December 5, 1994, plaintiff/respondent unilaterally and surreptitiously fled the United States of America with the minor child of the parties and thereafter expressed her intention to the defendant/petitioner to disobey the orders of this court. Plaintiff/respondent has wrongfully removed the child from the United States of America and the State of Utah, and wrongfully retains the child in the Federal Republic of Germany despite efforts of the defendant/petitioner to have the child returned within the meaning of Articles 1, 3, and 5 of The Convention.

5. At the time of the wrongful removal and retention defendant/petitioner was actually exercising his right of custody within the meaning of Articles 3 and 5 of The Convention and has not consented to the child's wrongful removal and retention outside the State of Utah, United States of America.

(*Id.* at Pages 3–4.)

34. The court concluded that under Utah law, federal law and the Hague Convention it had jurisdiction (*id.* at pages 2–3) to issue and, therefore, did issue an order requiring Maria to return Stephan. (*Id.* at Pages 6–7.)

35. When the Utah judge signed the December 1, 1995, order clarifying the "wrongful removal," Joe, apparently using the American Central Authority as he had done in the past, made a second application to the German Central Authority to take action under the Convention. (Filing 85, Aff. Ann Morton ¶¶ 4–5.) In addition, the December 1, 1995, order was submitted to the German family court. (Filing 84, Ex. D (German Documents), Doc. 5.)

36. The time for appeal in Utah passed and Maria elected not to appeal the court's December 1, 1995, order. (Filing 84, Ex. A, Dep. Brent R. Chipman, at 43:22–25, 44:1–5.) In fact, Chipman has conceded that the December 1, 1995, order was a "final order regarding the applicability of the Hague Convention as it relates to the Utah court" (*id.* at 45:7–10) and "all appeal times … have run … [m]ore than a year and a half ago." (*Id.* at 44:3–5.)

## The German Court's December 6, 1995, Response

37. On December 6, 1995, the German family court, recognizing the December 1, 1995, Utah court's clarification, issued an order. (Filing 84, Ex. D (German documents), Doc. 5.) The court first observed that "[b]ut for the submission of the Order of the Salt Lake County District Court dated December 1, 1995, the [court] would have rendered the decision [favorable to Maria] contained in the enclosed Draft Order." (*Id.* at Page 2.)

38. The "enclosed Draft Order" found in favor of Maria because, while the German court believed that Maria's removal of Stephan was clearly unlawful, Joe was not "'actually exercising' rights of custody [as compared to visitation] at the time of the removal" and thus Joe was not entitled to "return of custody" under the Hague Convention. (*Id.* at Page 7 of Attached Draft Order.) Thus, while Joe could enforce his visitation rights under the Hague Convention, he could not secure Stephan's return. (*Id.* at Page 8 of Attached Draft Order.)

39. The German court stated that the December 1, 1995, order of the Utah court "is, in principle, probably binding" on the German court. (*Id.* at Page 2 of Order of Dec. 6, 1995.) However, the German court gave the parties until December 29, 1995, to submit "final documents and written position statements." (*Id.*) The court also announced that it would render its decision on January 10, 1996. (*Id.*)

## On January 10, 1996, Joe Prevails in the German Litigation

40. On January 10, 1996, the German court ordered that "Maria Morton has to return the child Stephan Morton, born 10/12/89, to the State of Utah immediately." (*Id.* Doc. 6, at Page 1.) In a detailed opinion, the court found that Joe had "custody" rights under the Hague Convention. (*Id.* at Page 5.) In particular, the court found that:

Even one who has only the right to object to the taking of the child to a foreign country has custody rights as per Article 3 and 5 of the Hague [C]onvention. Under the Hague Convention, the restriction on mobility connected therewith is to be ac-

cepted. The state of origin can and will, protect the right of the other parent beyond the right of mere visitation with such restrictions.

(*Id.*)

41. The German court recognized that it could not ultimately decide the question of custody. (*Id.* at Pages 5–6.) However, after considering the opinion of the Youth Welfare Office, the court found that Stephan was not in "any imminent danger" if returned to Joe. (*Id.* at Page 6.) As a result, the exception found in Article 13(b)[14] of the Hague Convention was not applicable. (*Id.* at Page 5.)

**Maria's Appeals Are Unsuccessful**

42. With the assistance of German counsel, Maria appealed the decision of the German family court to a three–judge appeals court. (*Id.* Doc. 7.) On April 18, 1996, the appeals court, in a thorough opinion, rejected Maria's appeal and affirmed the decision of the German family court. (*Id.* (Opinion of the Oberlandesgericht Munchen (Court of Appeals) of April 18, 1996).)

43. With the assistance of counsel, Maria appealed the decision of the appeals court to the German Constitutional Court. (*Id.* Doc. 22.) The court denied the appeal because it did not present a constitutional question. (*Id.*)

**Maria Fails to Comply with Court Order, But Stephan is Returned**

44. On July 3, 1996, after Maria had either permitted or caused Stephan to be admitted to a psychiatric hospital, the German family court investigated and found that Maria "so far was not willing to participate voluntarily in the enforcement or return of the child to the US." (*Id.* Doc. 20, at Page 4.) The court also found that the return of Stephan to Joe did not pose a danger to the child despite the hospitalization. (*Id.* at Pages 3–4.)

45. On July 4, 1996, a German family court judge removed Stephan from the psychiatric hospital. (*Id.* Doc. 21.) After taking Stephan to the court house, the German judge returned Stephan to his father at 1:00 p.m. (*Id.*)

46. After that, Stephan returned to the United States with his father, and he now resides in Lincoln, Nebraska, with his father, his stepmother and a stepbrother. (Filing 40, Report of Guardian Ad Litem.)

47. The guardian ad litem[15] reports that Stephen is "strong and in good health," "well within the realm of a normal seven–year–old boy" and "is getting along well in school and in his family environment." (*Id.* at Page 3.)

## II. Conclusions of Law

### A. The Arguments

Joe argues that the decisions of the Utah and German courts are not open to attack, and this court must enforce those decisions. In particular, he asserts that "full faith and credit" and "res judicata" principles require that Maria's complaint be dismissed.

Maria, on the other hand, contends that the Utah court had no authority to change custody on August 2, 1995, under the Hague Convention; the December 1, 1995, order of the Utah court was obtained by fraud; and the December 1, 1995, order of the Utah court was incorrect under the Hague Convention because Joe did not have "custody" of Stephan. Thus, Maria argues that Joe's "full faith and credit" and "res judicata" defenses are inapplicable. Furthermore, she argues that she is entitled to the return of Stephan since the German court's return order under the Hague Convention was predicated upon a void and incorrect Utah decision.

### B. Joe's Motion

Both the Utah court and the German court entered orders under the Hague Convention requiring that Stephan be returned to the

---

14. A court need not order return of a child if there is a grave risk that return would expose the child to physical harm or otherwise place the child in an intolerable situation. CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, Oct. 25, 1980, Art. 13(b), 51 Fed.Reg. 10499 (1986).

15. The court appointed Gail S. Perry, Esq., to serve as Guardian Ad Litem in this case. (Filing 39.) The court thanks Ms. Perry for her excellent service.

United States. Stripped of the rhetoric, what Maria seeks to do in this litigation is to retry the prior cases and overturn the prior Utah and German final judgments requiring the return of Stephan to the United States. I find and conclude that Maria cannot attack the validity of the Utah and German court orders that required Stephan's return to the United States, and, consequently, Joe is entitled to summary judgment.

### 1. "Full Faith and Credit"

When, as Maria has done here, an application is made for relief under the Hague Convention, a court considering the application must give "full faith and credit" to the prior decisions of other courts that have ordered the return of a child under the treaty. *See* 42 U.S.C. § 11603(g). Section 11603(g) clearly states that: "Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering ... the return of a child, pursuant to the Convention, in an action brought under this chapter."

■ "Full faith and credit" as used in 42 U.S.C. § 11603(g) plainly means that a court must give preclusive and dispositive weight to a prior decision of another court that requires the return of a child from one country to another under the provisions of the treaty. *See also* H.R. REP. No. 100–525, at 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 386, 393–94 ("This means, for example, that if a court in one jurisdiction has ordered the return of a child and the child is located in another jurisdiction ... before that order has been executed, the order shall be given full effect in the second jurisdiction....").

As result, if the elements of the "full faith and credit" defense exist now, I must give preclusive and dispositive weight to the decisions of both the Utah court and the German court that required Stephan's return to the United States under the provisions of the Hague Convention. *See, e.g., Burns v. Burns,* No. Civ. A. 96–6268, 1996 WL 711274 (E.D.Pa. Dec.6, 1996) (where a wife claimed that her husband lured her from England to the United States wrongfully to detain the children in the United States to obtain custody, a Pennsylvania federal court was bound

by the decision of a Pennsylvania divorce court holding that the Hague Convention had not been violated by the husband's actions).

### 2. "Res Judicata"

Even if one were to ignore the "full faith and credit" provisions of 42 U.S.C. § 11603(g), Maria would still have to overcome the "res judicata" (claim preclusion) provisions of federal common law. *See, e.g., County of Boyd v. U.S. Ecology, Inc.,* 858 F.Supp. 960, 966 (D.Neb.1994) (applying federal common law to the Central Interstate Low–Level Radioactive Waste Compact and dismissing case based upon application of res judicata (claim preclusion) principles), *aff'd,* 48 F.3d 359 (8th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995). In other words, if Maria's claim is based upon some provision of federal law other than the Hague Convention and the related implementing legislation, then we will not permit Maria to overturn the final decisions of the Utah and German courts to obtain the return of Stephan if such a decision would violate the federal common law of res judicata.

I am aware that Maria might be called a "defendant" in the prior litigation because she defended against Joe's effort to secure the return of Stephan. From this perspective, it could be argued that res judicata principles do not apply to her because she has not previously asserted any claim as a "plaintiff."

However, "[c]laim preclusion rules addressed to plaintiffs are mirrored by preclusion rules addressed to defendants." 18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4414, at 108 (1981) (discussing defendant preclusion). Thus, Maria may not avoid the preclusive impact of the prior Utah and German decisions simply by calling herself a "defendant" in those prior cases. *Id.* at 111 ("[D]efendant preclusion applies even though the original action was brought in state court, and the former defendant brings a second action in federal court to assert federal constitutional defenses that were omitted from the state action.") (citations and footnote omitted)

### 3. Elements of "Full Faith and Credit" and "Res Judicata"

In this context, the goals of the doctrine of "full faith and credit" and the doctrine of "res judicata" seem similar. Both doctrines seek to avoid wasteful duplicative litigation. Both doctrines seek to safeguard the reliance and repose interests of the prevailing party in the prior litigation.[16] Therefore, it is proper to assume that the elements of a "full faith and credit" defense under 42 U.S.C. § 11603(g) are similar to the elements of a "res judicata" defense under federal common law.

Accordingly, Joe must prove four things to obtain summary judgment based upon his "full faith and credit" or "res judicata" defenses. Joe must prove that: (1) a court of competent jurisdiction rendered a prior judgment; (2) the prior decision was a final judgment on the merits; (3) the same (or a similar) cause of action is involved in this case and the prior cases; and (4) the same parties or those in privity are involved in all cases. *See, e.g., County of Boyd,* 858 F.Supp. at 966 (citing *Headley v. Bacon,* 828 F.2d 1272, 1274 (8th Cir.1987) (in turn citing *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979))).

### 4. "Full Faith and Credit" and "Res Judicata" Applied

■ I find and conclude that Joe has proven each element of his "full faith and credit" or "res judicata defense." In particular, I find and conclude that: (1) both the Utah court and the German court were courts of competent jurisdiction and both courts entered a prior judgment; (2) the prior Utah and German decisions were final judgments on the merits—Stephan must be returned to the United States; (3) the same cause of action was involved here and the prior cases—that is, this case, and the prior cases, involve a prayer for the return of Stephan

under the Hague Convention based upon nearly identical operative facts; (4) the same parties—Joe, Maria, and Stephan—are involved in all cases. Accordingly, unless Maria can establish some exception that makes Joe's defense inapplicable, we must enter summary judgment in favor of Joe.

### C. Maria's Motion

Maria seeks to avoid Joe's "full faith and credit" or "res judicata" defense and to obtain summary judgment in her favor by making three arguments. She argues that: (1) under the Hague Convention the Utah court had no authority to change custody on August 2, 1995, because Joe had also filed his Hague Convention application with the Utah court; (2) the December 1, 1995, Utah court order was obtained by fraud; and (3) the December 1, 1995, Utah court order was wrong on the merits regarding the Hague Convention since Joe was not the custodial parent within the meaning of the Convention. (Pl.'s Br. Supp. Mot. Summ. J. at ii; Pl.'s Br. Reply Def.'s Mot. Summ. J. at 1.) Essentially, Maria argues that everything the German court did was premised upon an invalid or fraudulent Utah decision. Thus, Maria argues that if the Utah court decision fails, so must the German decision.

I reject each and all of Maria's claims. Overall, all of her claims are factually unfounded or legally unsupported. I will separately, but briefly, explain my reasons for rejecting her specific arguments.[17]

### 1. Jurisdictional Challenge to August 2, 1995, Custody Decision

It is undisputed that the Utah court issued the original custody decree and on August 2, 1995, modified that decree by giving temporary and permanent custody of Stephan to Joe. It is further undisputed that Maria's lawyer received the petition to modify the decree, and that he answered the petition.

---

**16.** This is especially true for cases involving children.

**17.** In doing so, I have initially assumed, without deciding, that the first two of the three arguments advanced by Maria may raise exceptions to the applicability of Joe's "full faith and credit" and "res judicata" defenses. *See, e.g.,* 18 Charles Alan Wright, Arthur R. Miller, Edward H. Coo-

per, *Federal Practice and Procedure* § 4415, at 121–136 (1981) (discussing exceptions to claim preclusion rules). As to the third argument, it is a challenge to the merits of the Utah court's December 1 Hague Convention ruling. Therefore, the third argument is dependent upon Maria overcoming Joe's defenses.

In the answer, Maria's lawyer did not object to the jurisdiction of the court to modify the decree. It is also undisputed that on August 2, 1995, there was pending before the Utah court Joe's application for relief under the Hague Convention; that is, Joe had petitioned the Utah court for a return order under the Hague Convention at the time the Utah court modified its prior custody decree.

■ Maria argues that the Hague Convention prohibits a court from considering the underlying merits of custody disputes. Thus, she argues that the Utah court could not give custody of Stephan to Joe since it was also confronted with Joe's Hague Convention return application. This argument does not persuade me.

Under the Hague Convention a court considering a petition for a return order lacks the power to decide the underlying merits of the custody dispute *if* the court also lacks a separate jurisdictional basis for doing so. 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."). Maria's argument fails, however, because the Utah court, having issued the original custody decree, maintained jurisdiction *under Utah law* to change custody since Stephan resided in Utah at the time of the abduction. *See, e.g., Curtis v. Curtis,* 789 P.2d 717, 724 (Utah.Ct. App.1990) (where a divorce decree was issued by Utah court and former wife later challenged the former husband's failure to return the children to Utah after a visit, and former husband responded by moving for enforcement of Mississippi court's modification order, the Utah Court of Appeals held that the Mississippi court lacked jurisdiction while Utah court had continuing jurisdiction; applying, among other sources, the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A(d) (1989)).

As a result, the Hague Convention did not prohibit the Utah court from changing custody under Utah law though it could not do so under the Convention. Simply put, the "remedies established by the Convention and this chapter shall be in addition to remedies available under other laws...." 42 U.S.C. § 11603(h) ("Remedies under Convention not exclusive").

### 2. Fraud Challenge to December 1, 1995, Return Order

Maria claims that the December 1, 1995, Utah court order was obtained by fraud. Condensed, Maria makes the following "fraud" claims: (1) the court's order was obtained without giving Maria a fair opportunity to oppose the order; (2) under 42 U.S.C. § 11603(b) the German court, not the Utah court, was the proper court to consider a motion for a return order; (3) Joe lied to the court when he stated in his second letter that the return order was requested by the "Central Authority." None of these arguments have merit.

#### a. Due Process

■ Maria was given a full and fair opportunity to contest the December 1, 1995, ruling of the court. The letters that initiated the December 1, 1995, order were made available to Maria's counsel, and the court held an in–chambers hearing on November 29, 1995, to consider the letters. Maria's lawyer was present and able to oppose the clarification request. Moreover, before issuing the December 1, 1995, order, Maria's lawyer was provided with a copy of the order and given an opportunity, which he took, to file written objections.

Still further, the relief requested was nothing more than a clarification of the earlier, fully litigated, rulings of the Utah court. The Utah court had held hearings on July 27, 1995, and August 2, 1995. Before those hearings, Maria and her lawyer had been served with a formal motion for return under the Hague Convention. Despite being informed by her lawyer that she should attend the hearing, and despite the fact Joe had made money available to purchase airline tickets so Maria could return to the United States, Maria declined to appear in person. After she declined to appear, the court issued an order on August 2, 1995, that, among other things, explicitly ordered Maria to return the child. Consequently, the December 1, 1995, order of clarification could hardly have surprised Maria or anyone else.

In summary, Maria was accorded ample due process because Maria was: (1) served, on May 19, 1995, with a petition for return of the child under 42 U.S.C. § 11601 and a notice of hearing; (2) granted a formal evidentiary hearing on August 2, 1995 (which she refused to attend); (3) explicitly ordered to return the child on August 2, 1995; (4) provided with an in-chambers hearing on November 29, 1995, regarding Joe's request for clarification; and (5) given an opportunity, which she took, to submit formal written objections to the December 1, 1995, order.[18]

### b. "Fraudulent" Jurisdiction

Although it is not clear, Maria appears to argue that the Utah court's December 1, 1995, order was fraudulent because the Utah court lacked jurisdiction under the Hague Convention to issue a return order. I am not persuaded.

Maria relies upon 42 U.S.C. § 11603(b) which states in part that a petition "for the return of a child" may be filed under the Convention "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction *in the place where the child is located at the time the petition is filed.*" (Emphasis added). Relying on the emphasized language, Maria argues that Stephan was in Germany when Joe filed his return petition in Utah, and thus the Utah court lacked jurisdiction to issue a return order. Consequently, Maria argues that the Utah court's December 1, 1995, order was fraudulent.

■ Maria misunderstands what Joe and the Utah court did. While the Utah court ordered the return of Stephan under the Convention, it did so to establish "wrongfulness" under Article 3 of the Convention. It had the jurisdictional authority to do so.

Article 3(a) & (b) of the Convention states that a "removal is to be considered wrongful where ... it is in breach of rights of custody ... *under the law of the State in which the child was habitually resident immediately before the removal ....*" and "*at the time of removal ... those rights were actually exercised ....*" (emphasis added). The Utah court had the power to declare what was "wrongful" under its law for the purpose of establishing "wrongfulness" under Article 3 of the Convention. This follows because federal law explicitly provides that American courts "have concurrent original jurisdiction of actions arising under the Convention." 42 U.S.C. § 11603(a).

That the Utah court had jurisdiction to act is made clear by the State Department's legal analysis of the Convention. The State Department has explicitly advised United States citizens to seek the type of "wrongfulness" determination that the Utah court made on December 1, 1995:

> In the United States, a left–behind parent or other claimant can petition for custody after the child has been removed from the forum.... *[T]he parent in the United States would be well–advised to request an explicit finding as to the wrongfulness of the alleged removal or retention within the meaning of Article 3 in addition to seeking custody.*

51 Fed.Reg. 10509 (App. C) (1986) (State Department's Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction) (emphasis added).

In summary, the December 1, 1995, order was not fraudulent. The Utah court had jurisdiction to decide "wrongfulness" under the Convention because such a determination turned on an interpretation of Utah law and the Utah divorce decree.

### c. The "Lie"

Maria claims that Joe "lied" when he stated in a letter to the Utah court that: "Attached is the Order of Wrongful Removal *requested by The Central Authority* clarify-

---

**18.** Vaguely, Maria complains that the Utah court entered the November 29, 1995, order (proposed by Joe) without consultation with counsel. However, I do not believe the record supports this assertion because it is undisputed that the judge held an in-chambers hearing with counsel on November 29, and Chipman testified that "my log sheets do note that I met with the judge and with Joy Jelte *to review the order of wrongful removal submitted by Joe Morton.*" (Filing 84, Ex. A, Dep. Brent R. Chipman, at 47:11–13 (emphasis added).) In any event, the operative order which Maria attacks and which was referenced by the German court was the order of December 1, 1995. As to that order, Maria received all the process which she was due.

ing the wrongful removal of my son, Stephan." (Filing 84, Ex. C (Utah Documents), Doc. 32 (emphasis added).) Maria claims that this statement is not truthful since the *German* Central Authority did not request such an order. For two reasons, this argument does not persuade me.

Initially, even if the statement was inaccurate, such a misstatement does not entitle Maria to relief from the "full faith and credit" or "res judicata" defense asserted by Joe. "Mere presentation of false evidence ... does not generally warrant relief" from the claim preclusion rules. 18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4415, at 129 (1981) (discussing exceptions to claim preclusion rules).

Ignoring such an alleged untruth is particularly appropriate because the Utah court did not rely upon it.[19] *See Rhodes v. Meyer*, 334 F.2d 709, 715–16 (8th Cir.) (alleged misstatements in affidavits filed in prior civil rights case did not prevent doctrine of res judicata from being applied to two subsequent civil rights actions, where the court in the first action had not relied upon the affidavits in reaching a conclusion adverse to the plaintiff), *cert. denied*, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964). The Utah court was required to be concerned only with Joe's request for clarification, and not why Joe wanted a clarification. As a result, whether the German Central Authority had "requested" a return order was irrelevant to the Utah court's December 1, 1995, order of clarification.

More fundamentally, Joe did not lie. His reference in the letter about the "Central Authority" was to the American, and not the German, Central Authority. The American Central Authority had suggested to Joe that he obtain such an order.

The confusion about what Joe meant by his letter reference to the "Central Authority"

arose during Joe's deposition. Joe was asked by Maria's lawyer about who had requested the order of removal, and Joe erroneously responded, "I thought it was the German Central Authority." (Filing 69, Dep. Joseph W. Morton, at 30:1–3.) It turns out that the *German* Central Authority had not requested the order, and Joe, accordingly, corrected his deposition answer.

However, the *American* Central Authority had advised Joe to obtain the order. The United States Department of State, acting as the American Central Authority[20], wrote Joe on October 25, 1995. The State Department essentially told Joe that if he could obtain a wrongful removal order from the Utah court, then the American Central Authority would help Joe in making a second Hague application with the German Central Authority. (Filing 69, Dep. Joseph W. Morton, Ex. 24.)[21]

Then, as suggested by the State Department, when the Utah judge signed the December 1, 1995, order, Joe, apparently using the promised assistance of the State Department, made a second application to the German Central Authority to take action under the Convention. (Filing 85, Aff. Ann Morton ¶¶ 4–5.) In this regard, Joe's conduct was entirely consistent with what Joe had earlier told the Utah court in his letter; that is, Joe told the court: "If you are willing to sign this very basic Order I will ... send it overnight to The Central Authority with a new application for Hague assistance." (Filing 84, Ex. C (Utah Documents), Doc. 32.)

In summary, misstatements are generally not grounds for ignoring "full faith and credit" or "res judicata" principles. Moreover, Joe's "Central Authority" reference related to the American Central Authority and not the German Central Authority. Consequently, since the American Central Authority suggested the course of action that Joe pursued, he did not perpetrate a fraud on the

---

19. For example, the orders of November 29, 1995, and December 1, 1995, make no reference to any "request" by the German Central Authority.

20. The State Department is America's "Central Authority." *See* 42 U.S.C. § 11606(a) (authorizing the President to designate a Federal agency

as the "Central Authority") & Executive Order No. 12648, 53 F.R. 30637 (Aug. 11, 1988) (President Reagan designated the State Department as the "Central Authority"), *reprinted in* 42 U.S.C.A. § 11606, at 512–13 (1995).

21. The entire letter is reproduced at Pt. I ¶ 26 of this Memorandum and Order.

Utah court when he referred to the "Central Authority" as requesting the order.

### 3. Challenge on the Merits to December 1, 1995, Return Order

Maria argues that Joe had no right of "custody" under the Hague Convention, and the Utah court was wrong on the merits when it concluded otherwise in the December 1, 1995, order. Maria claims that all Joe had was the right of visitation, and thus the most he could get from the Hague Convention was a visitation order rather than a return order. Thus, Maria argues that I should set aside the German return order because that order was dependent upon the Utah order and the Utah order was wrong under the Convention. I reject this argument.

Maria cannot challenge the merits of the Utah decision unless she can avoid the "full faith and credit" and "res judicata" defense asserted by Joe. As shown earlier, Maria cannot overcome those defenses. Consequently, the court will not probe the merits of the Utah court's application of the Hague Convention, and therefore both the Utah and the German decisions will stand.

### III. Conclusion

Maria is not entitled to an order returning Stephan to her because principles of "full faith and credit" and "res judicata" require me to honor the decisions of the Utah and German courts. Maria is free, however, to return to the United States and seek a change of custody before the appropriate domestic relations court.[22]

Accordingly,

IT IS ORDERED that:

1. Joe's motion for summary judgment (filing 80) is granted, and Maria's motion (filing 78) for summary judgment is denied.

2. Judgment will be entered by separate document providing in substance that judgment is entered for Joseph W. Morton and against Maria Ernst Morton, her complaint is dismissed with prejudice, and costs, includ-

ing the fees of the guardian ad litem, are taxed to her.

3. Gail S. Perry is discharged as Guardian Ad Litem, and Ms. Perry is requested to submit her bill for services rendered in accordance with this court's order of January 21, 1997. (Filing 50.)

4. The Clerk of the Court shall mail a copy of this memorandum and order and the related judgment to counsel of record and Gail S. Perry.

---

22. If Maria comes to this country and seeks custody before a domestic relations court, I agree with the German court that "[t]he American court should not ... draw conclusions from the kidnapping [about] the unfitness of the mother as a caretaker." (Filing 84, Ex. D (German Documents), Doc. 6, at Page 6.) This is particularly true where, as here, the evidence could be interpreted to suggest that the mother left this country due to the father's failure to pay child support.