Maria Esperanza VELEZ, Appellant,

v.

Charles John MITSAK, Appellee.

No. 08–01–00246–CV.

Court of Appeals of Texas,
El Paso.

Aug. 29, 2002.

Rehearing Overruled Oct. 23, 2002.

Adair Dyer, Austin, for Appellant.

John L. Williams, El Paso, for Appellee.

Before Panel No. 2, BARAJAS, C.J., McCLURE, and CHEW, JJ.

### OPINION

ANN CRAWFORD McCLURE, Justice.

This appeal concerns the Hague Convention [1] ("Convention") as implemented by the United States in the International Child Abduction Remedies Act [2] ("ICARA"), and involves a request by a father for an order requiring a mother to return their child to Spain, the country from which the child was removed in 1999. The issue is whether the trial court erred in according full faith and credit to an

---

1. *See* Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 51 Fed.Reg. 10494, 10498–502 (App.B) 1986.

2. *See* 42 U.S.C.A. §§ 11601–11610 (1995).

Italian judgment that adjudicated a prior Convention petition and ordered the child returned to Spain. We reverse and remand.

## FACTUAL AND PROCEDURAL SUMMARY

Maria Esperanza Velez and Charles Mitsak are the parents of Ezra Mitsak, born in El Paso, Texas on September 15, 1997. Aside from the child's date of birth, Velez and Mitsak dispute almost every fact leading up to the filing of this suit on May 21, 2001.[3] According to Velez, she and Mitsak were teachers employed abroad as civilian employees of the United States Department of Defense. While the parties dispute whether they were married, Velez and Mitsak lived together for a period of time in Spain, but separated in January or February 1999. Velez left Spain with Ezra and traveled to Italy. Mitsak claims that Velez did not tell him where she was going. After he discovered that Velez was living and working in Italy, he filed for custody in a Spanish court and sought the return of the child under the Hague Convention in an Italian court. Velez claims that she, her daughter, and Ezra were physically abused by Mitsak during their stay in Spain. She also claims that she was transferred to Italy by the Department of Defense and that Mitsak was aware of her transfer.

In early December 1999, the Spanish court gave custody to Velez although she was unaware of the ruling until much later. On December 22, 1999, the Italian court heard Mitsak's Convention application and ordered that Mitsak could return with Ezra to Spain for a custody decision. Velez contends that Mitsak obtained the Italian order fraudulently because he did not inform the court that Velez had already been granted custody in Spain. Mitsak contends that the Spanish order has since been vacated. In turn, Velez alleges that she has initiated proceedings in Italy to have the Italian order set aside. She also claims to have initiated further proceedings in Spain where an order has been entered and appealed by Mitsak.

Mitsak disputes that Velez has appealed the Italian order. He argues that she simply ignored the order, fled from Italy and did not tell him where she was going. He located her in Mexico and filed a Convention petition there but Velez allegedly would not comply with any court orders for visitation. He also maintains that Velez submitted to the federal court in Mexico either a fake Mexican birth certificate or a legitimate—but fraudulently obtained—birth certificate which listed the last name of the child as Velez rather than Mitsak. Mitsak discovered that Velez had returned to El Paso in May 2001. He filed a petition for the return of the child under the Convention in the 65th District Court of El Paso County, Texas on May 21. The petition alleged in pertinent part:

> 3.1 Petitioner has rights of access to the child within the meaning of Articles Three and Five of the Convention in that the child was wrongfully removed from Spain in February 1999 without

---

**3.** Some of the facts recited here are taken from the contentions of the parties in their briefs in a parallel mandamus proceeding which was consolidated with this appeal for purposes of argument. We have, by opinion issued this same date, denied the petition for writ of mandamus because there exists an adequate remedy by way of appeal. *See In re Velez,* No. 08–01–00228–CV, 2002 WL 1997936 (Tex.App.-El Paso August 29, 2002, no pet. h.). Neither party testified in the trial court. Because the record in this appeal does not include sufficient material to provide a complete factual development, we rely upon some of the factual assertions made in those briefs. Notation is made of those factual assertions that are disputed by the parties.

the consent of Petitioner. Petitioner learned the child and his mother were in Italy and he filed under the Convention to have the child returned to him. Before the child was turned over to him, Respondent disappeared from Italy with the child. In February of 2000, a Spanish court granted Petitioner rights of access to the child. However, Petitioner has not been given access to the child. The Interpol Police has submitted a request to Mexico to locate the child so Petitioner could have access.

3.2 The Petitioner at the time of the wrongful removal or retention was actually exercising custody within the meaning of Articles Three and Five of the Convention.

\* \* \* \* \*

3.3 The child was born on September 15, 1997 in El Paso, Texas and will be sixteen (16) years of age on September 15, 2013, twelve years after the date of this application.

3.4 The child was habitually resident in Spain within the meaning of Article Three of the Convention immediately before the removal of the child from Spain by Respondent.

\* \* \* \* \*

5.1 Spain has not issued an order for custody of the child in favor of Petitioner. However, Petitioner has filed proceedings in Spain to gain custody.

Mitsak also filed a petition for a warrant in lieu of a writ of habeas corpus under the Convention, based on a breach of his right to custody and/or access within the meaning of Article 3 of the Convention. The court issued a warrant on May 22, ordering that the child be taken into protective custody and released to Mitsak. Velez filed a motion for injunctive relief on May 24, expressing her fear that if Mitsak were given possession of the child, he would remove Ezra from the jurisdiction of the court. She also alleged that Mitsak had a long history of domestic violence, had directed violence toward Velez's daughter, and had made threats to harm Ezra. The court granted her injunctive relief and ordered the child returned to the custody of Child Protective Services.

Velez filed her original answer to Mitsak's petition on June 4. She claimed that removal of the child was not wrongful because on December 2, 1999 the Spanish court had awarded custody of the child to her and established scheduled visits for the parties. She also specifically pled defensive theories that (1) there was a grave risk that Ezra's return would expose him to physical or psychological harm or otherwise place him in an intolerable situation; (2) that Mitsak had filed his petition more than one year following the alleged wrongful taking and that the child had settled in a new environment; and (3) that there was a question as to whether Mitsak was exercising custody rights at the time of the alleged wrongful removal.

Mitsak filed a first amended petition on June 5. He reiterated his claims that he had custody rights to the child and that the child was wrongfully removed from Spain. In support of his claims, he attached an e-mail and two letters as exhibits. The e-mail, from Esther Pias Garcia of the Spanish Central Authority, stated:

Dear Guillermo,

I would like to communicate to you that the Judge of First Instance No. 4 of El Puerto de Santa Maria, has given the custody to Mr. Mitsak. For this reason, Mr. Mitsak's lawyer is going to change the request, demanding now the return of the child instead of the right of access. He will send all the documents to the american [sic] lawyer in El Paso.

The letters were also from Ms. Garcia. She wrote that Velez left Spain on January 9, 1999, traveled to Italy and Mexico, and was currently in the United States. She also stated that there was "a wrongful removal, because in Spain, the State in which the child was habitually resident immediately before the removal, according to Article 154 of the Spanish Civil Code both parents have parental responsibility for the children." The second letter stated in pertinent part:

[T]here is a new judicial decision of 1.09.2000 the First Instance Court of El Puerto de Santa Maria discharging the decision of the First Instance court of El Puerto de Santa Maria of 2.12.1999. Consequently now both parents have parental responsibility in respect of the child.

Also attached to the petition was the Italian judgment, accompanied by a purported English translation, which ordered the return of the child to Spain. The translation stated that Ezra was a habitual resident with his parents at their residence in El Puerto de Santa Maria, Spain until February 1999 when his mother extracted him without notice to or prior knowledge of the father. It also stated that Articles 154 and 156 of the Spanish Civil Code were applicable; these provisions grant both parents the rightful custody of their children. The translation also recited that Velez's allegations[4] had not been substantiated, did not demonstrate child endangerment, and were not valid reasons for failing to return Ezra to Spain.

Velez filed a first amended original answer on June 7. She pled that she and Mitsak were civilian members of the "sending state," and that they and their

child were not subject to the same legal status as the citizens of the "receiving state" under the Convention. Consequently, she urged that Mitsak's petition be dismissed.

A hearing on Mitsak's application was conducted on June 8 in the El Paso district court. Counsel for Velez sought a continuance and argued that the English translation of the Italian judgment contained a "discrepancy or an omission" in that Mitsak had failed to advise the Italian court of the Spanish custody order. Counsel for Mitsak opposed the continuance and argued that this was a summary proceeding according to the Hague Convention. He claimed that a continuance would cause hardship to his client, who had come from Spain for the hearing, and a hardship for Ezra, who had been in foster care since May 23. The court denied the continuance. Although Mitzak's attorney advised the court that he had witnesses available, he suggested "that you don't even need to hear any testimony." Instead, he referenced the Italian judgment and told the court "that decision should be given full faith and credit by you here today, Judge. And ... we don't need to litigate this any further."

The trial court then read excerpts from a letter he received from the United States Central Authority and commented on them as follows:

The U.S. Central Authority writes to me and tells me as set forth: 'We write to inform you that the Central Authority of Spain has submitted an application for the return of Ezra Mitsak to Spain with the U.S. Central Authority under the Hague Convention. We draw your attention to certain important articles of

---

**4.** According to the translation, these "accusations and allegations" referred to "the overdosed administration of aspirin to the child or the allege [sic] claim made by the plaintiff as

[sic] the effect that he 'would sacrifice his child as Isaac did if the defendant left his side.' "

the Convention. Article 11 of the Convention requires the judicial or administrative authorities of contracting states,' and that's us here in the United States, 'to act expeditiously in proceedings for the return of children.'

In denying your motion today, Mr. [counsel for Velez], that is exactly what I'm doing. I am acting expeditiously to determine whether or not this child is to be returned to Spain.

'In addition, judicial or administrative authorities of the contracting state to which the child has been removed or in which it was been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.'

The guidelines that the Central Authority has given me is that I'm not to get into the merits of this case, i.e., who is entitled to this child, who has custody of this child. My only decision to be made here today is whether or not this child is to be returned to Spain.

They also invite my attention to Article 17, which provides that the sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested state, that's us, shall not be a grounds for refusing to return the child under this Convention, but the judicial or administrative authorities of the requested state may take account of the reasons for that decision in applying this convention.

I'm assuming that means that just because there is an order in Italy, that doesn't mean that the child is returned automatically. I can consider it as a reason for returning the child solely.

* * * * *

The purpose of me getting this on the record is so that the parties are aware that I have reviewed all of these documents. I believe I have brought myself up to speed on the Hague Convention and I think I'm quite familiar with it.

The court then asked the parties whether there were any orders to be presented from any court in any other country. Mitsak offered into evidence the Italian judgment and the English translation, both of which were admitted. He also offered the two letters and e-mails we have already discussed and two birth certificates. Only the American birth certificate was admitted. Mitsak also introduced an Interpol warrant written in Spanish stating that return of the child could not be accomplished because the mother had left Italy with the child. Velez's objections to this exhibit were sustained.

Mitsak did not testify in support of his petition. Although his counsel did not specifically address the seventeen-month time lapse between Velez's departure from Italy with Ezra and the filing of the petition in El Paso, he did argue that Velez has "a whole history" of hiding and abducting the child. Velez's counsel attempted to address the validity of the Italian judgment in light of Mitsak's failure to notify the court of the prior Spanish custody award. As the attorneys began to argue, the court instructed them to take their seats. He then ruled without hearing any oral testimony. The written order provides:

The Judgment of the Italian court from December 1999 ordering that the child be returned to Spain in accordance with the Hague Convention was amongst the exhibits admitted in accordance with 42 U.S.C.A. 11605. The Court assumes that the translation of the judgment was correct and gives full faith and credit to that judgment in accordance with 42

U.S.C.A. 11603(g). Said judgment orders the child be returned to Spain in accordance with the Hague Convention. IT IS ORDERED that, pursuant to the provisions of The Convention on the Civil Aspects of International Chid Abduction, done at the Hague on 25 October 1980 and/or the International Child Abduction Remedies Act, 42 U.S.C. 11601 et seq, CHARLES MITSAK, shall return the minor child, EZRA MICHAEL MITSAK, ... to his residence and to retain possession of the child until such time as the Spanish authorities make further orders.

Later that same day, Velez filed a motion for temporary emergency relief with this court. We granted the motion and ordered all proceedings in the trial court stayed and barred the trial court from enforcing its order returning the child pending our ruling on Velez's petition for writ of mandamus. Before our order could be delivered to the parties, Mitsak left the jurisdiction with Ezra. Velez filed a writ of mandamus on June 12 and a notice of appeal on June 27. The writ of mandamus and the appeal were consolidated for purposes of argument.

In Point of Error One, Velez argues that the trial court erred in granting full faith and credit to the Italian court's judgment pursuant to ICARA. *See* 42 U.S.C.A. § 11603(g). Consequently, she contends the trial court had no subject matter jurisdiction to grant full faith and credit to a judgment by a court of a foreign country. In her second point, Velez complains that according full faith and credit to the Italian judgment caused the court to deny an evidentiary hearing on whether it should defer to the Italian judgment. In her third and fourth points, Velez contends the

trial court's failure to hear testimony on these material issues denied her due process of law under the United States Constitution and constitutes reversible error.[5]

## STANDARD OF REVIEW

In reviewing the trial court's adjudication of Mitsak's Convention petition, we apply a *de novo* standard. While no other court in Texas has reviewed a trial court's determination of whether to give deference to an earlier Convention petition adjudicated by a foreign court, the issue has arisen in the federal context. In *Diorinou v. Mezitis,* the United States Court of Appeals for the Second Circuit addressed the deference that a United States court should accord to a judgment of another country which has adjudicated a prior Convention petition. *Diorinou v. Mezitis,* 237 F.3d 133 (2nd Cir.2001). The court concluded that although the standard of review had not been explicitly articulated, the appellate courts should consider *de novo* the proper application of full faith and credit, *res judicata* and comity. *Id.* at 138–40.

## THE HAGUE CONVENTION

■ The Convention seeks to provide a remedy for international child abductions and to restore the "factual" status quo which is unilaterally altered when a parent abducts a child. *Flores v. Contreras,* 981 S.W.2d 246, 248 (Tex.App.-San Antonio 1998, no pet.). The United States ratified the Convention in 1986 and became a contracting state in 1988 through the federal implementing statute—ICARA. ICARA confers concurrent original jurisdiction in state and federal courts over actions arising under the Convention. *See* 42 U.S.C.A. § 11603(a). Jurisdiction is grant-

---

**5.** Velez assigns a fifth point of error in which she generally complains of the order requiring that Ezra return to Spain. The argument, however, merely constitutes an explanation as to why the case is not moot despite the fact that the child has already left our jurisdiction.

ed only as to the merits of the abduction claim; the statute does not grant jurisdiction to decide the underlying custody dispute. *Id.*; *Lops v. Lops,* 140 F.3d 927 (11th Cir.1998); *Friedrich v. Friedrich,* 78 F.3d 1060, 1063 (6th Cir.1996); *Flores,* 981 S.W.2d at 248. Under the Convention, each country has a Central Authority which is responsible for discharging the duties imposed by the Convention and cooperating with the Central Authorities of other countries to secure the return of children. Convention, arts. 6, 7. Article 1 of the Convention provides that the objectives are twofold:

> (a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and
>
> (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Convention, art. 1. Courts have also acknowledged a separate purpose of deterring parents from crossing borders in search of a more sympathetic court. *Friedrich,* 78 F.3d at 1063.

Under Article 3 of the Convention, a "removal" or a "retention" is "wrongful" if:

> (a) it is in breach of rights of custody attributed to a person ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3. "Habitual residence" is not defined in either the Convention or ICARA, but instead must be applied to the facts and circumstances of each case. *Flores,* 981 S.W.2d at 249.

In determining whether there has been a wrongful removal or retention, the court may take judicial notice of the law and judicial decisions "in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Convention, art. 14. To obtain a remedy under the Convention, a petitioner must show by a preponderance of the evidence that the child has been wrongfully removed within the meaning of the Convention. 42 U.S.C.A. § 11603(e)(1)(A); *In re Prevot,* 59 F.3d 556, 560 (6th Cir.1995). The application, together with the documents or any other information appended to the application or provided by the Central Authority, is admissible in the courts of the contracting states. Convention, art. 30.

Once the petitioner has established these requisite elements, the party opposing the return of the child has an opportunity to raise various defenses:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person ... which opposes its return establishes that—
>
> (a) the person ... having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or
>
> (b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Convention, art. 13. Article 20 further permits a court to refuse to return the child "if this would not be permitted by the fundamental principles of the requested

State relating to the protection of human rights and fundamental freedoms." Convention, art. 20. The party opposing return of the child must establish the defenses in Article 13b and Article 20 by clear and convincing evidence. 42 U.S.C.A. § 11603(e)(2)(A). Any other defense in Article 13 must be established by a preponderance of the evidence. 42 U.S.C.A. § 11603(e)(2)(B). The person opposing the return of the child may also attempt to show by a preponderance of the evidence that the proceeding was not initiated within one year of the wrongful removal or retention and that the child has settled in his or her new environment:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

Even where the proceedings have been commenced after the expiration of one year, the court shall order the return of the child unless a party demonstrates that the child is now settled in its new environment. Convention, art. 12; 42 U.S.C.A. § 11603(e)(2)(B). If the person opposing the return of the child does not establish one of these defenses, the return of the child is mandatory. *See Friedrich*, 78 F.3d at 1067 ("Once a plaintiff establishes that removal was wrongful, the child must be returned unless the defendant can establish one of four defenses."). However, even if a party proves one of the defenses available, the return of the child is a matter of judicial discretion. Convention, art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."). Furthermore, these defenses have been narrowly construed. *Friedrich*, 78 F.3d at 1068–69. At least one court has held that a federal court should exercise its discretion when appropriate "to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.* at 1067, *citing Feder v. Evans–Feder*, 63 F.3d 217, 226 (3d. Cir.1995).

## FULL FAITH AND CREDIT UNDER 42 U.S.C.A. § 11603(g)

■ It is clear from the record before us that the trial court's decision to defer to the Italian judgment and order the child's return to Spain was based on the principles of full faith and credit mentioned in the Convention's implementing legislation:

> Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.

42 U.S.C.A. § 11603(g). The term "State" is defined as "any of the several States, the District of Columbia, and any commonwealth, territory, or possession of the United States...." *Id.* at Section 11602(8). Only one federal circuit court has interpreted the meaning of this ICARA provision. *See Diorinou v. Mezitis*, 237 F.3d 133, 142 (2nd Cir.2001). There, the appellate court reviewed a decision to accord full faith and credit to a Convention adjudication by a Greek court. *Id.* The court reasoned that it might be possible to read "States" in Section 11603(g) to mean "Contracting States" if the definition in Section 11602(8) were understood to define only the singular "State" and not the plural "States". But the legislative history "clearly indicates" that the word "States" in Section 11603(g) refers to the states of the United States. *Id. citing* H.R.Rep.

No. 100–525, at 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 386, 393–94 ("Section 4(g) provides that full faith and credit shall be accorded throughout the United States to judgments and orders *of courts in the United States* rendered with regard to return actions pursuant to the Convention and the Act.) (emphasis added)." [6] Moreover, the court pointed to the Restatement (Second) of Conflict of Laws as support for the proposition that judgments rendered in a foreign nation are not entitled to full faith and credit as a general matter. *Id. citing* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98 cmt. b (1971). However, American courts will nevertheless accord considerable deference to foreign adjudications as a matter of comity:

> Even if the limited scope of section 4 implies a legislative preference not to extend formal full faith and credit recognition to foreign judgments, we see nothing in ICARA or its legislative history to indicate that Congress wanted to bar the courts of this country from giving foreign judgments the more flexible deference normally comprehended by the concept of international comity.

*Id.* at 143.

Following the reasoning in *Diorinou,* we believe the district court misapplied ICARA's full faith and credit provision as a basis for according deference to the Italian judgment. Instead, the trial court should have determined deference as a matter of comity, particularly on the issue of whether the Italian judgment was obtained by fraud. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98 (1971). The exercise of comity is at the heart of the Convention. *See Blondin v. Dubois,* 189 F.3d 240, 248 (2nd Cir.1999). The comments to Section 98 of the Restatement (Second) of Conflict of Laws reveal that:

> Judgments rendered in a foreign nation are not entitled to the protection of full faith and credit. In most respects, however, such judgments, provided that they are valid under the rule of § 92,[7] will be accorded the same degree of recognition to which sister State judgments are entitled.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98 cmt. b. (1971). As a condition of recognition, an American court must be convinced that the foreign court had jurisdiction and that "there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting, or fraud in procuring the judgment." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 98 cmt. d (1971), *citing Hilton v. Guyot,* 159 U.S. 113, 202, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Points of Error One and Two are sustained.

---

**6.** The paragraph provides further:

> This means, for example, that if a court in one jurisdiction has ordered the return of a child and a child is located in another jurisdiction in the United States before that order has been executed, the order shall be given full effect in the second jurisdiction without the need to initiate a new return action there pursuant to the Convention and the Act.

*Id.* at 394.

**7.** § 92. Requisites of a Valid Judgment

A judgment is valid if

(a) the state in which it is rendered has jurisdiction to act judicially in the case; and
(b) a reasonable method of notification is employed, and a reasonable opportunity to be heard is afforded to persons affected; and
(c) the judgment is rendered by a competent court; and
(d) there is compliance with such requirements of the State of rendition as are necessary for the valid exercise of power by the court.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 92 (1971).

## DUE PROCESS

■ Having determined that the trial court misapplied Section 11603(g), we now turn to the due process issues. Velez claims that although ICARA contemplates a summary proceeding rather than a full trial, the guarantees of due process under the United States and Texas Constitutions apply such that she should have been given an opportunity to be heard. She asks that we reverse and remand for an evidentiary proceeding.

At the hearing below, Velez advised the court that the Italian judgment was fraudulently obtained in that Mitsak did not notify the Italian court of the Spanish order that awarded custody to her. Although not a model of clarity, we can also discern from the record that Velez objected that the English translation of the Italian judgment contained errors related to Mitsak's alleged history of domestic violence against her and her children. Mitsak counters that Velez was granted due process because she was given notice of the proceeding, she appeared at the hearing, and she was represented by counsel. He argues that the Convention contemplates that courts will summarily decide matters and promptly return the child to his or her habitual residence.

■ The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty or property without due process of law." U.S. CONST., art. V. Procedural due process is examined in two steps: we must determine first, whether a litigant has been deprived of an existing liberty interest, and second, whether the procedures attendant upon the deprivation of the liberty interest were constitutionally sufficient. *Egervary v. Rooney*, 80 F.Supp.2d 491, 498 (E.D.Pa. 2000), *citing Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The courts have consistently held that parents have a fundamental liberty interest in the custody of their children. *Egervary*, 80 F.Supp.2d at 498–99, *citing Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir.1997)(mother had a constitutionally protected liberty interest in the custody of her children which could not be deprived without due process); *Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir.1994)(few rights are more fundamental than those of parents to retain custody of their children); *Weller v. Dep't. of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir.1990)(father had a clear liberty interest in the custody of his children); *Robison v. Via*, 821 F.2d 913, 921 (2nd Cir.1987)(parent's interest in custody of children is constitutionally protected interest which cannot be deprived without due process); *Hooks v. Hooks*, 771 F.2d 935, 941 (6th Cir.1985)(parents have a liberty interest in the custody of children); *Lossman v. Pekarske*, 707 F.2d 288, 290 (7th Cir.1983)(father had a liberty interest in custody of children); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2nd Cir.1977)(liberty interest in familial privacy).

■ As to the second prong, we must determine whether the procedures by which Velez was deprived of her liberty interest were sufficient. The opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). ICARA provides that notice "shall be given in accordance with the applicable law governing notice in interstate child custody proceedings." *Egervary*, 80 F.Supp.2d at 499, *citing* 42 U.S.C. § 11603(c).

Courts interpreting this provision have found the 'applicable law' to be the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A ('PKPA'), and the Uniform Child Custody Jurisdiction Act, 23

Pa.C.S.A. § 5341, et seq. ('UC-CJA').... Both the PKPA and UCCJA provide for 'reasonable notice and opportunity to be heard.' ... This generally means 'a plenary hearing at which both sides are heard.' [Citations omitted].

*Id.*

Velez was not given an opportunity to present evidence at the June 8 hearing. *Cf. Morton v. Morton,* 982 F.Supp. 675, 687–88 (D.Neb.1997)(party opposing Convention petition for return of child was accorded due process where she was granted a formal evidentiary hearing which she refused to attend). As the petitioner, Mitsak was required to demonstrate by a preponderance of the evidence (1) that Ezra was an habitual resident of Spain; (2) that he had lawful custody rights to Ezra—either jointly or solely—when the child was wrongfully removed; and (3) that at the time of removal, he was actually exercising those rights or would have done so but for the removal. The Italian judgment establishes the first two requirements; it is silent as to the third. There being no evidence on the issue, Mitsak failed to establish his *prima facie* entitlement to return of the child. Even had he done so, Velez was entitled to the opportunity to establish the defenses she had pled and to challenge the Italian judgment on the ground that it was procured by fraud. It was surely not contemplated by the drafters of the Convention that the provision requiring contracting states to use the most expeditious procedures available to implement the objectives of the Convention would override a party's right to present evidence on possible defenses as provided in the articles or on considerations of whether a foreign judgment was obtained by fraud. Points of Error Three and Four are sustained.

## CONCLUSION

We recognize that Mitsak and Ezra have left the jurisdiction and that our ruling necessitates their return. It may well be that after a full evidentiary hearing, the trial court will order Ezra's return to Spain.[8] Nevertheless, we cannot gloss over the niceties of the constitutional protections which are implicated here. We reverse and remand for further proceedings.

---

**8.** The fact that a party may ultimately prevail has been found unpersuasive:

Defendants seek to moot the obvious conclusion that plaintiff's rights under ICARA were violated by arguing that Oscar would have been immediately returned to Ms. Kovacs even if a hearing had been held that day.... The Court cannot accept that conclusion. Mr. Egervary had compelling, though not necessarily dispositive, arguments that could have been presented if he had been afforded notice and opportunity to be heard.
\* \* \* \* \*
The Court makes no finding as to whether Mr. Egervary would have prevailed on any of these arguments. Such a finding would not be possible without a full evidentiary hearing ... It is nonetheless clear that plaintiff was deprived of any opportunity to present these arguments.

*Egervary,* 80 F.Supp.2d at 500–01.