**In the Interest of J.G. and C.G.**

**No. 05–08–00717–CV.**

Court of Appeals of Texas,
Dallas.

Nov. 18, 2009.

Robert E. Fitzgerald, Dallas, TX, for Appellant.

Matt Thomas, Dallas, TX, for Appellee.

Before Justices BRIDGES, O'NEILL, and FITZGERALD.

## OPINION

Opinion By Justice FITZGERALD.

J.B. ("Father") filed a Petition for Return of Children to the Petitioner in the trial court, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention"). In the petition, Father charged that E.G.H. ("Mother") wrongfully removed their two children, J.G. and C.G., from Mexico and brought them to Texas in an effort to avoid custody proceedings Father initiated in Mexico. The trial court agreed with Father and signed an Order Granting Petition to Return Children and Order Directing Return of Minor to Country of Habitual Residence (together, the "Order"). Pursuant to the Order the children were returned to Father, and Father and the children have returned to Mexico. Mother appeals the Order, challenging the sufficiency of the evidence to support the trial court's findings. We reverse the trial court's Order.

### I. BACKGROUND

Mother and Father lived together in California. They had two children together: J.G., who was born in 2004, and C.G., who was born in 2005. When Mother was pregnant with C.G., she developed a medical condition that the family could not afford to have treated in the United States. In August 2005, shortly after C.G.'s birth, Mother took the children to Mexico with her, and she underwent the surgery she needed. She and the children lived with Father's mother in Mexico City while she

recuperated. Father testified that he stayed in the United States for two months after Mother traveled to Mexico, and that he sent money to Mother in Mexico for her surgery. Mother testified that Father arrived in Mexico in the second half of September 2005.

The evidence indicates that Father and Mother disagreed about whether and when to return to the United States. Father testified that after he arrived in Mexico, Mother told him that she wanted to return to the United States after she recovered, and he told her he did not want to return to the United States. Mother's testimony was consistent with Father's as to her own intent; she testified that she told Father that she wanted to return to the United States at the end of September. As to Father's intent, she testified that Father asked if they could stay in Mexico until Christmas:

> [H]e asked me if we can stay until December because he hadn't seen his family for two years. So he wanted to be past Christmas in Mexico with the family. So I asked him again, Do you promise? And he says, Yes.

The new baby, C.G., was baptized in Mexico on December 10, 2005. Mother testified that she and Father argued on that day because he said that they were going to stay in Mexico and she wanted to return to the United States. She also testified that she was virtually a prisoner in Father's mother's home because she did not have a key to the gate. This testimony, however, was undercut by her stepsister's testimony that Mother was not held prisoner and in fact traveled about in Mexico to go to at least one party with Father's mother. Finally, Mother left Father's mother's house in early January 2006 and took her children to her father's house in Mexico City. She lived there until April or May of that year, when she moved

in with a relative or friend of her stepsister. Throughout this time period, Mother testified, Father refused to give her financial support. Also during this time period, Father filed a custody suit and attempted to serve Mother with the appropriate papers; he testified he was unable to find her. In August 2006, Mother left Mexico and, at her stepsister's urging, took the children with her to Texas. She and the children then lived with her stepsister in Texas for over a year. She was still living in Texas, but not with her stepsister, at the time of the hearing.

Father learned of the whereabouts of his family sometime in 2007, and he initiated these proceedings under the Hague Convention to have the children returned to Mexico. After hearing testimony from Father, Mother, and Mother's sister, the trial court found:

1. The minor children's habitual residence is Mexico.

2. [Mother] wrongfully removed the children from their habitual residence in or around January of 2006.

3. [Mother] wrongfully removed the minor children from [Father] in breach of [Father's] rights of custody.

4. [Mother] failed to show any of the exceptions set out in the Hague Convention that would preclude return of the children to Mexico.

Based on these findings, the trial court ordered the children returned to Mexico. Mother appeals.

## II. THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION

 The United States agreed to the Hague Convention in order to protect children from the harmful effects of wrongful removal from the country of their habitual residence and to establish procedures to

ensure their prompt return to that country. *In re A.V.P.G.*, 251 S.W.3d 117, 122 (Tex.App.-Corpus Christi 2008, no pet.). The Convention preserves the pre-removal status quo of the parties' custody arrangements, and it deters a parent from crossing international boundaries to find a more sympathetic court. *Id.* The Convention is premised on the principle that the country of the child's habitual residence is best suited to determine questions of child custody and access. *Id.* Thus, in a wrongful-removal case like this one, the court is authorized only to determine rights under the Convention; the court has no authority over any underlying custody claims. *See id.*

The Hague Convention has been implemented in the United States through the International Child Abduction Remedies Act ("ICARA"). *See* 42 U.S.C.A. §§ 11601–11610 (West 1988). The ICARA gives concurrent jurisdiction to federal district courts and state courts to hear cases arising under the Convention. *Id.* § 11603(a). It also establishes the procedures whereby a parent can petition for the return of a child who has been wrongfully removed from the child's habitual residence to the United States. *See id.* § 11603. A petitioner establishes wrongful removal by proving, by a preponderance of the evidence, that the removal of the child was made in breach of the rights of custody of the petitioner under the law of the country in which the child habitually resided immediately before the removal. *Id.* § 11603(e)(1)(A) (burden of proof); Hague Convention art. 3, 19 I.L.M. 1501, 1502 (1980) (when removal considered wrongful).

### III. MOOTNESS

 As a threshold issue, Father argues the appeal is moot because J.G. and C.G. have already returned to Mexico with him. Courts may only decide issues that present a "live" controversy at the time of the decision. *Camarena v. Tex. Employment Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). An appeal is moot when a court's action on the merits cannot affect the rights of the parties. *Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex.2007).

Father relies on a federal case, *Bekier v. Bekier*, 248 F.3d 1051 (11th Cir.2001). In *Bekier*, a father sought return of his son to Israel, and the district court ordered the boy's return. On appeal, the court concluded that once the child had returned to Israel with his father, the court "became powerless to grant the relief requested by [the mother]." Accordingly, the court of appeals dismissed the appeal. *Id.* at 1055.

Other federal courts of appeals have criticized *Bekier* and have reached the merits of the case despite the fact the child at issue had already been returned to the petitioning parent. *See generally Fawcett v. McRoberts*, 326 F.3d 491 (4th Cir.2003); *see also Whiting v. Krassner*, 391 F.3d 540 (3d Cir.2004). As one court pointed out, "no law of physics would make it impossible" for a parent to comply with an order to return a child to the United States. *Fawcett*, 326 F.3d at 496. On the contrary, the parent could comply with a return order voluntarily or after penalties were assessed for failure to comply, or an order could be enforced if the parent traveled to the United States at some future time. *See id.* Moreover, there are ways in which an appellate ruling could "affect the rights of the parties" other than by effecting the actual return of the child. *See Zipp*, 218 S.W.3d at 73. For example, although Hague Convention proceedings cannot resolve custody issues, a determination that a parent wrongfully removed a child, or did not wrongfully remove a child, could certainly have implications for the removing parent in future custody pro-

ceedings. *See Whiting,* 391 F.3d at 545–46.

At least one Texas court has addressed the merits of a Hague Convention appeal although the children had already been returned to the petitioning parent's country pursuant to the trial court's order. In *Velez v. Mitsak,* 89 S.W.3d 73 (Tex.App.-El Paso 2002, no pet.), a father petitioned for return of his child to Spain. He had already obtained a judgment of wrongful removal in a Hague Convention proceeding in Italy, where the mother and child first lived after leaving Spain. The judgment ordered the child to be returned to Spain. *Id.* at 75. However, the mother argued the Italian order was procured by fraud. She also alleged affirmative defenses to the order, including abusive treatment of her and the child by the father. *Id.* at 77–78. The trial court ruled without hearing any testimony, granting the father's petition solely on the basis of giving full faith and credit to the Italian court's order. *Id.* at 78–79. The mother sought a stay from the court of appeals the same day, but before the court's stay order could be delivered to the father, he had returned to Spain with the child. *Id.* at 79. The El Paso court concluded the mother had been denied due process when she was denied the opportunity to offer testimony challenging the Italian order and supporting her affirmative defenses to the petition. *Id.* at 84. The court concluded:

> We recognize that [the father] and [the child] have left the jurisdiction and that our ruling necessitates their return. It may well be that after a full evidentiary hearing, the trial court will order [the child's] return to Spain. Nevertheless, we cannot gloss over the niceties of the constitutional protections which are implicated here. We reverse and remand for further proceedings.

*Id.* In a brief supplemental Opinion on Motion [for] Clarification, the court directed the trial judge "to order the return of the child to the jurisdiction of the court upon the terms and conditions he deems appropriate." *Velez v. Mitsak,* 89 S.W.3d 84, 85 (Tex.App.-El Paso 2002, no pet.).

The *Velez* court addressed the merits of the mother's appeal with implicit confidence it could affect the rights of the parties. We likewise conclude our resolution of this appeal can affect the rights of these parties. Therefore, we reject Father's argument that this appeal is moot.

## IV. ANALYSIS OF THE MERITS

### A. Standard of review

Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that the children habitually resided in Mexico and that Father had "rights of custody" to the children under Mexico law. Father argues that we should apply federal standards of review, reviewing the trial court's factual findings for clear error and its interpretation and application of the Convention to the facts de novo.

Texas appellate courts have reviewed habitual-residence determinations under the Convention using an abuse-of-discretion standard of review, reasoning that the issue presents a mixed question of law and fact. *In re S.J.O.B.G.,* 292 S.W.3d 764, 776 (Tex.App.-Beaumont 2009, no pet.); *In re J.J.L.-P.,* 256 S.W.3d 363, 372 (Tex.App.-San Antonio 2008, no pet.). Moreover, employment of the abuse-of-discretion standard would be consistent with our practice in domestic controversies involving the possession of children. *Jacobs v. Dobrei,* 991 S.W.2d 462, 463 (Tex.App.-Dallas 1999, no pet.). Accordingly, we will analyze Mother's complaints under the abuse-of-discretion standard of review. Under that standard, we defer to the trial

court's factual determinations if they are supported by the evidence and review questions of law de novo. *In re S.J.O.B.G.*, 292 S.W.3d at 776. We are mindful that Father bore the burden of proving the elements of a wrongful removal by a preponderance of the evidence in order to obtain relief. 42 U.S.C.A. § 11603(e)(1)(A).

## B. Habitual residence in Mexico

■ In her first and second issues, Mother challenges the trial court's finding that the children habitually resided in Mexico. The term "habitual residence" is not defined in the Convention or in the ICARA. Unquestionably, it is a concept intended to be applied to the facts and circumstances of each case. *Flores v. Contreras*, 981 S.W.2d 246, 249 (Tex.App.-San Antonio 1998, pet. denied). But Texas courts and various federal courts have applied a number of different standards in determining the habitual residence of a child; the different standards vary primarily in their emphasis either on the acclimatization of the child to his new residence or on the understandings and intentions of one or both parents. *See id.* (focusing on child's perspective and acclimatization). A recent Texas opinion applied a hybrid standard adopted from an often-cited federal opinion on the subject:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally, the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a

new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*In re S.J.O.B.G.*, 292 S.W.3d at 780 (quoting *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir.2005)). We conclude this two-pronged standard gives proper weight to the various interests of all parties.

### 1. Evidence of mutual intent to fix the children's residence

The first prong of the *Gitter* standard required Father to show that his and Mother's last shared intent was to fix the children's residence in Mexico. We conclude that he adduced no evidence that Mother ever agreed or intended to fix their residence in Mexico.

It is undisputed that the last time Father and Mother shared an intent concerning the children's residence was when they lived in California. When Mother and the children went to Mexico, the parents both believed the move was temporary and would last only so long as necessary for Mother to have the medical procedure she needed and to recuperate from that procedure. Father admitted in his own testimony that Mother told him that she wanted to return to the United States after she recovered from her surgery. He further admitted that when they discussed staying in Mexico through the 2005 Christmas holidays, Mother wanted to return to the United States and he did not. Mother testified, and Father did not dispute, that she made him promise that they would return to the United States before she even agreed to seek her medical treatment in Mexico. No evidence supports the conclusion that Mother ever changed her mind—as Father did—and intended to make Mexico their children's residence.

Father argues that some evidence does support his position. First, he cites his testimony that he, Mother, and the chil-

dren lived together as a family in Mexico City at his mother's house. This evidence, however, does not prove that he and Mother ever shared a mutual intent to make Mexico their children's residence. The undisputed evidence shows that they relocated to Mexico only because Mother could obtain affordable medical care there and that Mother continuously maintained the desire and intent to return to the United States—at first intending to return after she recovered from her medical procedure, and then intending to return after extending the visit through the Christmas holidays at Father's request. Second, Father points to evidence that he and Mother had their infant, C.G., baptized in Mexico City in December 2005. We conclude that this evidence does not tend to show any intent by Mother to make Mexico the children's residence.

Father also points out that Mother took the children away from his mother's house without any of their passports, birth certificates, or immunization records, and that she stayed in Mexico City for six more months before moving to Texas rather than California when she returned to the United States. These facts do not alter our conclusion. There was no evidence that Mother's failure to collect the children's documents was inspired by a new intention to remain in Mexico; the only evidence on point was Mother's testimony that she left Father's mother's house with only a bag of diapers and the clothes she was wearing. As to her prolonged sojourn in Mexico City and her moving to Texas rather than California, the record makes clear Mother was receiving no financial assistance from Father and had very limited resources. Her stepsister testified and confirmed that after Mother moved out of Father's mother's house, Mother refused to contact Father because he did not want to go back to California with her and she still intended to go. Evidence showed that

her stepsister in Texas was willing to provide her with affordable living arrangements. Moreover, the Hague Convention is concerned with children being moved between *countries*. Thus, we focus our inquiry on the country where the parents last shared the intention to reside, not whether they agreed on a state within that country.

Accordingly, as to the first prong of the *Gitter* standard, we conclude that there is no evidence that the parents ever shared an intent that Mexico would be their children's habitual residence. *See Gitter*, 396 F.3d at 134; *see also Van de Sande v. Van de Sande*, No. 05–CV–1182, 2008 WL 239150, at *9–10 (N.D.Ill. Jan. 29, 2008) (children's habitual residence remained United States when family moved to Belgium based on father's promise to return after he completed school).

## 2. Evidence of acclimatization to Mexico

As to the second prong of the *Gitter* standard, we can identify no evidence in the record before us supporting the conclusion that these young boys had acclimatized to Mexico to such a degree that they acquired a new habitual residence there, notwithstanding their parents' last shared intent to the contrary. *See id.* The children moved to Mexico with Mother in June 2005, when J.G. was eighteen months old and C.G. was just weeks old. When they moved to Texas with Mother in August 2006, J.G. was approximately two and one-half years old, and C.G. was just over a year old. There is no evidence the children attended school in Mexico or were part of a meaningful social network beyond their extended family. *See, e.g., Tsarbopoulos v. Tsarbopoulos*, 176 F.Supp.2d 1045, 1055 (E.D.Wash.2001) (two-year-old and newborn who spent 27 months in Greece with mother "virtually all day ev-

ery day," with little socialization outside family, did not acclimatize to Greece so as to make it their habitual residence). Indeed there is no evidence either child was old enough "to form meaningful connections with the people and places he encounter[ed] each day." *See Whiting,* 391 F.3d at 550–51 (eighteen-month-old child lacked capability to form such connections, making parental intent paramount factor in determining habitual residence of very young child).

We conclude that there is no evidence that the children had so acclimatized to Mexico that the second *Gitter* prong would weigh in favor of habitual residence in that country. In light of this conclusion, we need not discuss whether Father possessed "rights of custody" under Mexican law.

### C. Conclusion

The trial court's finding that the children's habitual residence was Mexico was not supported by the evidence. Because Father bore the burden of proof on that issue, we conclude that the trial court abused its discretion by granting Father relief under the Hague Convention and the ICARA.

### V. DISPOSITION

For the foregoing reasons, we reverse the trial court's Order Granting Petition to Return Children and its Order Directing Return of Minor to Country of Habitual Residence, and we remand this case to the trial court for further proceedings consistent with this opinion. We direct the trial judge to order the return of the children to the jurisdiction of the court upon the terms and conditions she deems appropriate. *See Velez,* 89 S.W.3d at 85.