# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00413-CV

**M. A. R. G., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 303,460-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

M.A.R.G. (Father), who lives in Guatemala, appeals from the trial court's de novo order appointing non-parent caregivers as managing conservators of Father's two children, A.R. and C.E.[1] The trial court appointed the children's non-parent caregivers as their permanent joint managing conservators, did not appoint Father as a managing or possessory conservator, authorized Father to have one-hour of telephone contact with his children weekly, and granted the caregivers discretion whether to allow parental visitation. The trial court's order also addressed Mother's child, A.E., with father M.E. Because Mother and M.E. have not appealed the order, we affirm the de novo order to the extent it concerns the children's half-sibling A.E. However, because we conclude that the trial court abused its discretion as to Father's rights to

---

[1] We refer to M.A.R.G. by his initials or as Father, the children's mother as Mother, and the children and the other father by their initials. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

his children, we reverse the portion of the trial court's order regarding A.R. and C.E. and remand the case to the trial court for further proceedings consistent with this opinion.

**BACKGROUND**

In October 2018, the Department filed an original petition in a suit affecting the parent-child relationship concerning A.R. and C.E. and requested an order for protection of the children in an emergency arising from Mother's alleged conduct including using "cocaine and crystal meth." At that time, A.R., who was born in Guatemala in January 2015, was three-years old, and C.E., who was born in the United States in March 2017, was one-year old. Additionally, Mother was pregnant at that time with A.E., who was born in February 2019. The Department later amended its petition to include A.E.

In the removal affidavit, the Department's representative averred that M.A.R.G. was the father of A.R. and C.E. and that he lived in Guatemala. During the pendency of the case, the Department attempted to locate Father, including asking Mother for contact information, but she denied having his contact information. The Department also requested assistance from the Guatemala's Consulate General Office in Houston, Texas and checked Facebook but was unsuccessful in locating Father. In June 2019, the Department served Father by citation by publication in the Belton Journal, and the trial court appointed an attorney ad litem to represent Father's interests.

The final hearing before the associate judge occurred on September 26, 2019. Father did not personally appear, and his attorney announced "not ready." The attorney advised

2

the associate judge that they "located and spoke to [Father] on the phone last week"[2] and that Father had not "actually been served." The attorney also referenced the "Hague Convention," *see generally* 22 U.S.C.A. §§ 9001–11 (International Child Abduction Remedies Act or ICARA) (implementing Hague Convention on Civil Aspects of International Child Abduction), but the associate judge proceeded with the hearing. The Department did not seek to terminate parental rights but sought to have the children's caregivers, who were "fictive kin" to Mother, appointed as the children's permanent joint managing conservators.[3] The Department had placed the children and their half-sibling A.E. with the caregivers in March 2019, and Mother did not oppose the Department's recommendations for the children.

The only witness to testify at the September 2019 hearing was the caseworker overseeing the case beginning in July 2019. She testified that she contacted Father through "a phone number provided to her" around the time of the hearing. During the phone call, she told him that she "worked with the State and that the children had been removed from the mother," and Father responded that he "did not know anything that was going on because the Mother had left the country after some sort of argument,"[4] "had no idea where his children were," and "had filed a missing persons report for his children, but since the mother had left the country, he

---

[2] According to her testimony during the de novo hearing, the caseworker, who is fluent in Spanish, translated the phone conversation between Father and his attorney. This conversation was the attorney's first contact with Father.

[3] Initially, the Department's attorney advised the associate judge that the Department sought temporary managing conservatorship for A.R. and C.E. because Father had not been served, but the Department's attorney changed positions, stating that "[w]e're okay with PMC on all three kids then" after the associate judge commented, "Because if you don't plan on serving [Father] anyways, let's just let him go through whatever process he needs to go through because the kids will be where they need to be anyway."

[4] The caseworker testified that, although she could not recall exactly, Father told her something like the argument was between Mother and some other family member.

3

wasn't able to do anything about it." The caseworker further testified that it "seemed" to her that the information she conveyed to him was the first information he had received regarding his children.

On October 10, 2019, the associate judge signed an order appointing the caregivers as the children's non-parent joint managing conservators. The court found M.A.R.G. to be the father of A.R. and C.E., *see* Tex. Fam. Code §§ 160.201(b) (stating circumstances for establishing father-child relationship), .204 (addressing circumstances when paternity is presumed), but did not appoint him as managing or possessory conservator of the children. The children's caregivers were given discretion whether to allow parental visitation but ordered to allow Father one-hour of telephone contact with his children from 6:00 to 7:00 p.m. on Sundays. Relevant to the dispositive issues in this appeal, the findings in the order included:

> [T]he appointment of [Father] as the managing conservator of [A.R.] and [C.E.] would not be in the best interest of the children because the appointment would significantly impair the children's physical health and emotional development.

Father timely requested a de novo hearing concerning the associate judge's decision to appoint the caregivers as the joint managing conservators of his children.[5] Father

---

[5] Father also requested a de novo hearing on the associate judge's following findings regarding possession of and access to his children:

> [T]he appointment of either of the parents as a possessory conservator of the child/ren is not in the best interest of the child/ren because the appointment would endanger the physical or emotional welfare of the child/ren.

> [G]iving either of the parents possession of the child/ren pursuant to the "standard possession order" of the Texas Family Code would endanger the physical and emotional welfare of the child/ren.

also filed an answer generally denying the Department's allegations and sought the recovery and return of A.R. pursuant to the "Hague Convention" because A.R. "was abducted from his country of habitual residence, Guatemala" and Father did not consent to Mother removing A.R. from Guatemala and remaining with A.R. in the United States.

The de novo hearing before the referring court occurred in May 2020, and Father, who was in Guatemala, appeared by telephone for the hearing. *See* Tex. Fam. Code § 201.015 (addressing de novo hearing before referring court). At the outset of the hearing, the trial court stated that the hearing would be limited to "evidence of matters that were in existence" at the time of the September 2019 hearing, explaining that "anything that's happened since September 26th of 2019, will not be admissible and not be relevant in this hearing."[6] The witnesses at the hearing were Father and the caseworker, and the guardian ad litem provided his opinion to the trial court as it existed at the time of the September 2019 hearing. Mother did not appear for the hearing.

Father testified that he and Mother married in Guatemala in 2015 and lived together with A.R. until January 2017. He confirmed that A.R. was born in Guatemala and

---

[T]he possession and access to the child/ren by either of the parents provided by this Order are the least restrictive limitations to protect the physical and emotional welfare of the child/ren and are in the best interest of the child/ren.

In its briefing, the Department represents that Father was appointed possessory conservator, but the associate judge's order and the de novo order expressly state that no parent was appointed possessory conservator.

[6] *But see In re R.R.*, 537 S.W.3d 621, 623–24 (Tex. App.—Austin 2017, orig. proceeding) (describing de novo hearing before referring court as "new and independent action on those issues raised" in request for hearing and collecting cases in which "courts treat the de novo hearing as a new trial, in which the parties are permitted to present witnesses to testify as to the issues raised in the hearing request").

5

testified that he took care of A.R. until January 2017 when Mother, who was pregnant with C.E., "escaped with her brother" and A.R. to the United States without Father's consent or knowledge and that he did not know where they were. He testified that when he discovered that they were missing, he "quickly went to the PGN, the PGN here in Guatemala, and [he] quickly activated the Alba-Keneth Alert. That's an alert that gets activated here whenever a minor is missing or had been kidnapped or abducted."[7] He testified that he "went to the national police over there in Guatemala and also by the municipal judge" and confirmed that he pressed criminal charges for "abduction of a minor." He further testified that he never saw Mother again, that he "never had communications with her until long afterwards," that it had been more than one year since he had any communications with her, and that he did not know where she was when he did have communications with her.[8] Concerning the Department's case, he testified that he received a call in September 2019 telling him "that there had been a hearing and permanent conservatorship had been—already been declared and that's when [he] started finding out" and that he had not had any other contact with anyone regarding the case.

Although he had not had contact with A.R. after January 2017 or any contact with C.E., his plans for his children if they were returned to him was for them to live with him in Guatemala. He testified that he wanted his children to be returned to him "because [he] can't go visit them over there, and a video call is not the same thing as having them here" and that he would "take care of them" and be a "good father." He testified that the children would go to

---

    **7** Father attempted to offer a copy of the alert during the hearing, but the trial court did not allow it because the document was in Spanish. The record reflects that this type of alert in Guatemala is similar to an AMBER alert.

    **8** Father testified that when he did have contact with Mother, it was through Facebook Messenger. He also had contact with one of the caregivers through Facebook Messenger after he was told that they were taking care of his children.

6

school in the village where he lived; that he owns his home, two taxis, and another vehicle that he also uses as a taxi; and that he had family that would assist him with caring for the children, including his younger sister who lived at his home. He provided the court with his average monthly income at the time of the September 2019 hearing, and copies of his licenses and titles to operate his taxi business were admitted as exhibits. He also denied ever engaging in criminal conduct or using controlled substances.

The caseworker testified that she had her "first contact" with Father in a "very brief" call at the time of the September 2019 hearing through a phone number that the caregiver provided to her and that she explained to him that "his children were in care and that we are going to a final hearing." When asked if Father understood her, she answered that she did not "think that he had enough time to grasp what [she] was saying due to him not knowing where his children were" and that Father explained that "[t]he only thing he was able to tell [her] was that the last thing he knew he had filed a missing child report for his son because the mother had run off with him." She further testified that she "[did not] know anything about [Father]'s status" when asked if she had "any articulable concerns about [Father] being a danger to either of the children's health and welfare." When asked what steps were required for the Department to have considered Father as a placement for the children in September 2019, she testified that it would have needed to establish contact with him and that she was "not sure" about "everything else" because he lived outside the United States. She also testified that a home study would be required, but she was "not sure" who would have done it, "how the process is" done, or the amount of time needed, although she was "pretty sure we would have had to have gone through a consulate and coordinated it through us and his country."

The guardian ad litem recommended that the trial court leave the children where they were, although he "certainly" did not "have any problem with some sort of shared custody." He expressed concern that the children did not have a relationship with Father, and it was his opinion that the children should stay with their half-sibling A.E. and the caregivers. It was the guardian ad litem's understanding that the children "continued to do well" in that placement and that they were doing well prior to September 2019. When asked about an extension of the case in order to get some unresolved questions answered, the guardian ad litem answered that he did not know because he did not "know how to communicate with Guatemala" and that he "would want to have access to the mother to ask her to verify" Father's testimony during the hearing but did not know where Mother was and did not think that Mother "had any contact with anybody since November of last year." He also stated that he would want clarification about the interpreter's translation that Father said the mother "escaped." He expressed that he would like to know "what's going on behind" Mother feeling like she needed to leave with her two-year-old child and while seven months pregnant to "come to a whole other country."

In closing argument, the Department's attorney stated that the Department was "open" to the idea of Father being appointed a possessory conservator with the ability to work towards becoming a managing conservator and requested that, absent agreement, the trial court give Father visitation of one weekend a month and allow Father to have agreed electronic communication with the children. In its de novo order appointing managing conservator, however, the trial court adopted and approved the associate judge's findings, appointed the children's caregivers as the joint managing conservators, did not appoint Father as a managing or possessory conservator of his children, allowed parental visitation at the discretion of the joint

managing conservators, and ordered that Father "is allowed to have telephone contact with the children on Sundays between 6:00 p.m. and 7:00 p.m." Father's appeal followed.

## ANALYSIS

### Return of A.R. to Guatemala

In his first issue, Father "seeks mandamus for the trial court to immediately order the return of [A.R.] to him in Guatemala at the Department's sole expense." Father argues that the trial court abused its discretion or alternatively erred when it exercised jurisdiction over A.R. because he is in the United States illegally and should be deported back to Guatemala where he is a legal citizen. As authority for this position, Father points to the evidence of Mother's "unjustifiable conduct" of removing A.R. from Guatemala and taking him to the United States without Father's knowledge or consent and cites section 152.208 of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). *See* Tex. Fam. Code § 152.208(a) (stating generally that "if a court of this state has jurisdiction under this chapter because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction"); *In re Lewin*, 149 S.W.3d 727, 739–41 (Tex. App.—Austin 2004, orig. proceeding) (concluding that trial court lacked subject matter jurisdiction and abused its discretion in failing to enforce Hague Convention order).

The Department's petition, however, was not brought under the UCCJEA but under chapter 262 of the Family Code to protect the health and safety of the children. *See* Tex. Fam. Code § 262.001 (authorizing governmental entity with interest in child to file suit affecting parent-child relationship). "A suit brought by a governmental entity requesting an order under [chapter 262] may be filed in a court with jurisdiction to hear the suit in the county in which the

9

child is found." *Id.* § 262.002. Father does not challenge the underlying reasons for the Department's removal of his children from Mother or that A.R. was located in Bell County when the Department brought its suit.

Father also argues that A.R. was wrongfully removed and was being retained in the United States in violation of the Hague Convention on the Civil Aspects of International Child Abduction and that the Department should have taken action at its own expense to have him returned to Father. As support, Father cites section 152.315 of the Texas Family Code. *See id.* § 152.315(a). Father alternatively seeks reversal and a remand to the trial court "for an entirely new trial with mandamus to the Bell County Attorney's Office to immediately initiate a proceeding to obtain the return of [A.R.] to his Father in Guatemala under the Hague Convention on the Civil Aspects of International Child Abduction." Father, however, has not cited, and we have not found, authority that would require the trial court in the context of a chapter 262 case to order the "return" of A.R. to Guatemala "at the Department's sole expense" or to mandamus the Bell County Attorney's Office to initiate a proceeding to return A.R. to his Father. *See generally In re J.G.*, 301 S.W.3d 376 (Tex. App.—Dallas 2009, no pet.) (describing procedures and analysis under Hague Convention); *In re A.V.P.G.*, 251 S.W.3d 117 (Tex. App.—Corpus Christi-Edinburg 2008, no pet.) (same).

Section 152.315(a) of the Family Code provides in relevant part that in certain circumstances "involving the Hague Convention on the Civil Aspects of International Child Abduction, the prosecutor or other appropriate public official may take any lawful action, including resorting to a proceeding under this subchapter or any other available civil proceeding to locate a child, obtain the return of a child, or enforce a child custody determination." The plain language of this section provides discretion to the "appropriate public official" to take

10

lawful action, *see* Tex. Gov't Code § 311.016(1) ("'May' creates discretionary authority or grants permission or a power."), and the "appropriate public official may not represent any party" but "acts on behalf of the court," *see* Tex. Fam. Code § 152.315(b). Thus, even if we assume without deciding that the Department or the Bell County Attorney's Office has the authority to obtain the return of A.R. to Guatemala under section 152.315, we cannot conclude that the trial court abused its discretion when it did not require them to do so in the context of this case. We overrule Father's first issue.

**Conservatorship**

In his remaining four issues, Father challenges the portions of the trial court's order: (i) appointing the caregivers as the children's managing conservators and not appointing him as a managing or possessory conservator; (ii) giving the caregivers discretion to allow him parental visitation; (iii) allowing one hour of telephone contact weekly that is not enforceable; and (iv) not requiring the caregivers to provide him with information about his children or their whereabouts.[9] He challenges the legal and factual sufficiency of the evidence to support the trial court's underlying findings as to conservatorship, possession of, and access to his children.

Because it is dispositive, we limit our analysis to Father's challenges to the trial court's decision not to appoint him as a managing conservator of his children and its underlying finding that Father's appointment as a managing conservator would not be in his children's best interest because it would significantly impair the children's physical health and emotional development. Father challenges the legal and factual sufficiency of the evidence to support this

---

[9] *See* Tex. Fam. Code § 153.073 (listing rights of parent who is appointed as a conservator of child, including right to receive information from any other conservator concerning child's health, education, and welfare).

11

finding; argues that the trial court's failure to appoint him as a managing conservator of his children was an abuse of discretion, arbitrary, and manifestly unjust; and seeks reversal and remand to the trial court for a new trial on the issue of conservatorship.

**Standard or Review**

We review conservatorship determinations under the abuse-of-discretion standard of review. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.M.T.*, 592 S.W.3d 974, 976 (Tex. App.—San Antonio 2019, pet. denied). A trial court's conservatorship determination "may be reversed only if the decision is arbitrary and unreasonable." *In re J.A.J.*, 243 S.W.3d at 616.

Legal and factual sufficiency are not independent grounds of error but factors used to determine whether the trial court abused its discretion. *In re K.S.*, 492 S.W.3d 419, 426 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Under this standard, an appellate court considers whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Zeifman*, 212 S.W.3d at 588. Traditional sufficiency review applies with regard to the first question. *Id.*; *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.); *see City of Keller v. Wilson*, 168 S.W.3d 802, 807, 810 (Tex. 2005) (describing legal sufficiency review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (describing factual sufficiency review). A trial court does not abuse its discretion as long as there is some substantive, probative evidence to support its decision. *Zeifman*, 212 S.W.3d at 587; *Echols*, 85 S.W.3d at 477.

12

**Managing Conservator**

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code § 153.131(b)); *see In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) (recognizing that "[t]he presumption that the best interest of the child is served by awarding custody to [a] parent is deeply embedded in Texas law" (quoting *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000))); *Phillip v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00418-CV, 2012 Tex. App. LEXIS 2760, at \*23 (Tex. App.—Austin Apr. 4, 2012, no pet.) (mem. op.) (observing that parent-child relationship is constitutionally protected and that parent's right to care and control of child is fundamental liberty interest); *see also In re C.J.C.*, 603 S.W.3d at 807–08 (stating that there is "presumption that fit parents act according to the best interest of their children" and have a "fundamental right to make decisions concerning care, custody, and control" of their children (quoting *Troxel v. Granville*, 530 U.S. 57, 72 (2000))).

Although trial courts generally have broad discretion in determining family law matters, "the legislature has explicitly limited the exercise of that discretion when a nonparent seeks to be appointed managing conservator." *In re M.J.C.B.*, No. 11-14-00140-CV, 2014 Tex. App. LEXIS 12387, at \*3 (Tex. App.—Eastland Nov. 14, 2014, no pet.) (mem. op.) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex. 1990)). "When a court determines conservatorship between a parent and a nonparent, a presumption exists that appointing the parent as the sole managing conservator is in the child's best interest." *Id.* (citing Tex. Fam. Code § 153.131). Generally "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing

13

conservator or both parents shall be appointed as joint managing conservators of the child." Tex. Fam. Code § 153.131(a). Thus, it was the Department's burden to rebut the parental presumption by presenting proof by a preponderance of the evidence that appointment of Father as a managing conservator of his children would significantly impair his children's physical health or emotional development. *See id.* §§ 105.005, 153.131(a); *In re J.A.J.*, 243 S.W.3d at 616 (stating that "finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard"); *Lewelling*, 796 S.W.2d at 167 (observing that "strong presumption" in favor of parental custody imposes "heavy burden on a nonparent" and that "[i]t is no longer adequate to offer evidence that the nonparent would be a better custodian of the child"); *In re M.J.C.B.*, 2014 Tex. App. LEXIS 12387, at *3 (same).

Usually evidence of a parent's "specific actions or omissions" that demonstrate the award of custody to the parent would have a detrimental effect on the child is sufficient proof to rebut the parental presumption, but the evidence must do more than raise mere suspicion or speculation of possible harm. *See Lewelling*, 796 S.W.2d at 166–67 (holding that best interest of child is served by awarding custody to natural parent absent "evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child"); *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied) (discussing significant-impairment requirement and requiring evidence to do more than raise "suspicion or speculation of possible harm"); *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (explaining that "link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm" and that "[t]here must be evidence to support

14

the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm"); *see also In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.) (providing examples of types of parental conduct that may constitute significant impairment, such as severe neglect or drug abuse and explaining that "material time to consider is the present").

The plain language of section 151.131(a), however, "does not necessarily require proof of a parent's blameworthy conduct as a prerequisite to appointment of a nonparent as managing conservator." *In re R.T.K.*, 324 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2010, pet denied); *see In re G.R.W.*, 191 S.W.3d 896, 900 (Tex. App.—Texarkana 2006, no pet.) (observing that "even without evidence establishing any blameworthiness of the parent, the parental presumption can be rebutted by other evidence establishing the statutorily required negative effect on the child"). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code § 153.002; *see Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002) (explaining that "[s]uits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors"); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing non-exclusive factors for best-interest determination).

**Legal Sufficiency of Evidence**

Father argues that there was legally insufficient evidence to support the trial court's finding of significant impairment and, thus, that the Department did not overcome the parental presumption that he should be appointed the children's managing conservator. "In

15

determining whether there is legally sufficient evidence to support the finding under review, we examine the record for evidence and inferences that support the challenged finding, while disregarding all contrary evidence and inferences." *Zeifman*, 212 S.W.3d at 588. "We must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not." *Id.* (citing *City of Keller*, 168 S.W.3d at 828).

The evidence before the trial court showed that at the time of the de novo hearing, the children's ages were five and three; they had been living with the caregivers and their half-sibling for over one year, *see In re W.M.*, 172 S.W.3d 718, 726 (Tex. App.—Fort Worth 2005, no pet.) (recognizing "policy in Texas of trying to keep siblings together when it is in their best interest"); they were doing well in this placement, *see Holley*, 544 S.W.2d at 371–72 (including among factors to consider in best interest determination "emotional and physical needs of the child now and in the future" and "parental abilities of the individuals seeking custody"); and they did not have a relationship with Father. At the time of the hearing, Father remained in Guatemala, and he does not challenge the evidence concerning the Department's reasons for removing the children from the Mother; its efforts to locate him, although unsuccessful until around the time of the September 2019 hearing; or Mother's agreement to the children's placement with the caregivers. The guardian ad litem also expressed concern with Father's testimony that Mother "escaped" when Mother's reasons were unknown as to why she decided at seven-months pregnant to leave Guatemala and come to the United States with A.R. without Father's knowledge or consent.

Further, although the Department did not present affirmative evidence of Father's "specific actions or omissions" that would demonstrate that placing the children with him would

16

have a detrimental effect on the children, the trial court reasonably could have disbelieved or given less weight to Father's testimony about his care of A.R. prior to January 2017 and his ability to take care of his children if they were returned to him. *See City of Keller*, 168 S.W.3d at 819 (explaining that fact finder is sole judge of credibility of witnesses and weight to be given testimony and may choose to disbelieve witness); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (explaining that trial judge acting as fact finder may disbelieve witness); *see also Zeifman*, 212 S.W.3d at 588 (explaining that when conducting legal sufficiency review, appellate court disregards evidence contrary to finding unless reasonable factfinder could not); *In re G.R.W.*, 191 S.W.3d at 900.

In the context of the Department's suit for the protection of the children, we cannot conclude that the trial court had legally insufficient evidence on which to exercise its discretion concerning conservatorship. *See Zeifman*, 212 S.W.3d at 588; *see also Danet v. Bhan*, 436 S.W.3d 793, 797–98 (Tex. 2014) (determining that evidence was legally sufficient to support jury's finding of substantial impairment); *City of Keller*, 168 S.W.3d at 827 (explaining that "final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review").

**Factual Sufficiency of Evidence**

Father also argues that there was factually insufficient evidence to support the trial court's finding of significant impairment and, thus, that the Department did not overcome the parental presumption that he should be appointed the children's managing conservator. Under the factual sufficiency standard of review, we consider and weigh all the evidence in the record and overturn a finding only if it is so against the great weight and preponderance of

17

evidence as to be clearly wrong and manifestly unjust. *Cain*, 709 S.W.2d at 176; *Zeifman*, 212 S.W.3d at 588–89.

At the outset of the May 2020 hearing, the trial court advised the parties that it would "consider evidence of matters that were in existence" at the time of the September 2019 hearing—at a time when the Department had only had brief contact with Father—and that "anything that's happened since September 26th of 2019, will not be admissible and not be relevant in this hearing." Thus, the trial court apparently did not consider evidence of the current circumstances of the parties or the children. *See In re S.T.*, 508 S.W.3d at 492 (explaining that "material time to consider is the present" in significant impairment analysis); *see, e.g.*, *Shook v. Gray*, 381 S.W.3d 540, 542–43 (Tex. 2012) (observing that, without considering changed circumstances in custodial hearings, trial court may be unable to protect best interest of child).

Further the guardian ad litem stated that he "certainly" did not "have any problem with some sort of shared custody" between Father and the caregivers, and the Department's attorney represented to the court that the Department was "open—up to the idea and the understanding of [Father] being named as a possessory conservator with the ability to work with [the caregiver] towards eventually, you know, becoming even a managing conservator with her." When asked if she had "any articulable concerns about [Father] being a danger to either of the children's health and welfare," the caseworker was unable to identify any concerns, explaining that she did not "know anything" about his "status." She also was unable to identify the specific steps that would have been required for the Department to have considered Father as a placement for the children. She testified that the Department would have needed to establish contact with him but that she was "not sure" about "everything else" because he lived outside the United

18

States.  She also testified that a home study would be required, but she was "not sure" who would have done it, "how the process is" done, or the amount of time needed.

Given the parties' positions to the trial court and considering and weighing all of the evidence, we cannot conclude that the trial court had factually sufficient evidence on which to exercise its discretion as to its finding of significant impairment to overcome the parental presumption.  *See Zeifman*, 212 S.W.3d at 588–89; *see also Cain*, 709 S.W.2d at 176.  On this basis, we sustain Father's issues contending that the trial court abused its discretion when it did not appoint him a managing conservator of his children.  *See Zeifman*, 212 S.W.3d at 588.

## CONCLUSION

For these reasons, we affirm the trial court's de novo order to the extent it concerns the children's half-sibling A.E., but we reverse that portion of the trial court's de novo order concerning A.R. and C.E. and remand the case to the trial court for further proceedings consistent with this opinion.[10]

---

[10] Because this suit was tried as a child protection case, we are of the opinion that the hearing on remand to the trial court must be commenced within 180 days of this Court's mandate.  *See* Tex. R. App. P. 28.4(c).  On remand, the trial court should consider the children and parties' current circumstances, including a home study on Father by the comparable governmental entity in Guatemala to Child Protective Services. *See Shook v. Gray*, 381 S.W.3d 540, 542–43 (Tex. 2012) (explaining that "trial court must be able to consider the changed circumstances" in its determination of conservatorship on remand).  The Department should determine the necessary steps to promptly obtain a home study on Father such as, at a minimum, contacting the Guatemala Consulate.  Further, after the trial court determines conservatorship, it should reconsider its findings on possession of and access to the children in light of its conservatorship determination.

19

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed in Part; Reversed and Remanded in Part

Filed:   December 11, 2020